**BURLINGTON NORTHERN RAILROAD COMPANY, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America,**

**Iowa Power and Light Company, Intervenor.**

No. 81–2290.

United States Court of Appeals, District of Columbia Circuit.

Argued April 20, 1982.

Decided May 28, 1982.

Betty Jo Christian, with whom Robert Lewis Thompson, and Curtis H. Berg, Washington, D. C., were on the brief, for petitioner. John L. Sachs, Washington, D. C., entered an appearance for petitioner.

Cecelia E. Higgins, Washington, D. C., with whom Kathleen M. Dollar, and Robert S. Burk, I.C.C., Washington, D. C., were on the brief, for respondents. John J. Powers, III, Dept. of Justice, and John Broadley, I.C.C., Washington, D. C., entered appearances for respondents.

John M. Cleary, Frederic L. Wood, and Nicholas J. DiMichael, Washington, D. C., were on the brief, for intervenor.

Before TAMM and GINSBURG, Circuit Judges, and EDMUND L. PALMIERI *,

* Sitting by designation pursuant to 28 U.S.C.

Senior United States District Judge for the Southern District of New York.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The Staggers Rail Act of 1980, Pub. L. No. 96–448, 94 Stat. 1895 (Staggers Act or Act) (to be codified in scattered sections of 11, 45 & 49 U.S.C.), effected significant changes in the Interstate Commerce Act in the direction of deregulation. Congress sought to shrink the rate-setting role of the Interstate Commerce Commission (ICC or Commission) and to allow, "to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail." Staggers Act § 101(a), 49 U.S.C.A. § 1010a(1) (West Supp.1981). This case presents a transition period problem. It involves an alleged rate agreement between a carrier and a shipper that antedated the October 1, 1980, effective date of the Staggers Act, and an attempt by the carrier to increase the rate through a tariff tendered to the ICC on October 12, 1981, just over a year after the Staggers Act became effective. In the decision under review, the ICC rejected the tariff. We conclude that the Commission's decision reflects an assertion of authority inconsistent with the regime established by the Staggers Act. We therefore vacate the Commission's order and remand for action by the ICC consistent with this opinion.

## I. BACKGROUND

### A. *The statutory framework*

Until 1976, the ICC was empowered by Congress to superintend all rates charged by railroads. The Interstate Commerce Act, as it existed prior to 1976, required all rates to meet a "just and reasonable" standard, and it authorized the Commission to determine what constituted a "just and reasonable" rate in any given case. 49 U.S.C. §§ 1(5), 15(1) (1970). Reduction of the

Commission's rate-making superintendence commenced with the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L.No.94–210, 90 Stat. 31 (4–R Act). In that legislation, Congress confined the ICC's maximum reasonable rate regulation to situations in which the railroad had "market dominance" over the traffic involved. 49 U.S.C. § 1(5)(b) (1976).

In its administration of the 4–R Act rate regulation curtailment, the Commission gave the term "market dominance" an expansive interpretation. Reacting to the Commission's reading,[1] Congress included in the Staggers Act a jurisdictional threshold. Section 202 of the Act stipulates that the Commission shall not find market dominance if the rate a carrier charges is below a specified revenue-to-variable cost percentage (160 percent prior to October 1, 1981, 165 percent from October 1, 1981, to September 30, 1982, and higher levels in succeeding years). 49 U.S.C.A. § 10709(d)(2) (West Supp.1981).[2] By this stipulation, Congress effectively withdrew from the ICC authority to inspect for maximum reasonableness rates that fall below the specified threshold.

In addition to the Section 202 jurisdictional curtailment, Section 208(a) of the Staggers Act further circumscribes the Commission's authority to regulate rates. That section establishes procedures by which a carrier and a shipper may enter into, and obtain ICC approval for, service- and rate-setting contracts. 49 U.S.C.A. § 10713 (West Supp.1981). The reasonableness of rates set in contracts authorized under Section 208(a) is not subject to ICC regulation and "[t]he exclusive remedy for any alleged breach of a contract entered into under [Section 208(a) is] an action in an appropriate State court or United States district court, unless the parties otherwise

agree." *Id.* § 10713(i)(2). A "grandfather" clause preserves the status of pre-Staggers Act contracts:

The provisions of this section shall not affect the status of any lawful contract between a rail carrier and one or more purchasers of rail service that is in effect on the effective date of the Staggers Rail Act of 1980. Any such contract shall hereafter have the same force and effect as if it had been entered into in accordance with the provisions of this section. Nothing in this section shall affect the rights of the parties to challenge the existence of such a contract.

*Id.* § 10713(j).

In sum, under the Staggers Act regime: (1) rates are not subject to ICC reduction if the rail carrier lacks market dominance; (2) Section 202 excludes a finding of market dominance where the rail carrier's revenues from the transportation at issue do not exceed variable costs by a specified percent; (3) the ICC may not review for reasonableness rates established by contracts authorized under Section 208(a), nor may it serve as adjudicator of a breach of contract claim.

### B. *The Commission's pre-Staggers Act contract rate policy*

Prior to enactment of the Staggers Act, the legality of a rate agreement between shipper and carrier was less than crystal clear. *See ICC Interpretive Statement—Contract Rates*, Nov. 5, 1980, Joint Appendix (J.A.) at 98, 102 ("legality of [pre-Act] agreements was subject to some question at the time they were entered into"). Commencing in November 1978, the Commission attempted to develop and describe a "contract rate policy." Initially, the ICC announced that contract rates could be filed in tariff form and that it would approve such

---

**1.** *See* H.R.Rep.No.1035, 96th Cong., 2d Sess. 38, 115–17 (1980), U.S.Code Cong. & Admin. News 1980, p. 3978.

**2.** After September 30, 1984, market dominance will depend on a "cost recovery percentage." *See* 49 U.S.C.A. § 10709(d)(2)(E) (West Supp. 1981).

In contrast to the carrier's fixed costs, which are analogous to overhead costs of a manufacturing enterprise, variable costs vary directly with the amount of freight transported. A revenue-to-variable cost ratio indicates whether a route is "paying for itself." *See Burlington Northern, Inc. v. United States*, 661 F.2d 964, 967 nn.9–10 (D.C.Cir.1981).

rates "following the closest scrutiny [on a case-by-case basis] to determine whether they are economically justified and not anticompetitive." *Railroad Contract Rates; Policy Statement*, Ex Parte No. 358–F, 43 Fed. Reg. 58,189 (1978) (*Policy Statement I*).[3]

In a second policy statement, issued in February 1980, the ICC declared that where no contract rate was filed but a shipper alleged that a proposed rate violated a private agreement between shipper and carrier, the Commission would take the alleged agreement into account as a factor, among others, bearing upon the reasonableness of the rate. *Change of Policy, Railroad Contract Rates*, Ex Parte No. 358–F, 45 Fed. Reg. 21,719 (1980) (*Policy Statement II*). Further, the Commission explained that with respect to alleged agreements postdating November 9, 1978, the date of the ICC's first policy statement, the existence of a contract would create a presumption that a proposed rate change in excess of the contract rate is unreasonable and therefore unlawful under the Interstate Commerce Act. But the Commission added the qualification that

> there may be unusual and compelling circumstances which would rebut this presumption and warrant our upholding a rate change in excess of a contract rate. For example, the Commission might determine that a contract rate should not be enforced if it failed to contribute to the ongoing concern value of the carrier as required by 49 U.S.C. 10701(b) or is likely to imperil the carrier's ability to provide essential rail service to the public.

Pre-November 9, 1978, agreements, the Commission said, would be considered case-by-case. No presumption of illegality would attend proposed rates in excess of the rate set by contracts of this vintage. However, the ICC elaborated that

> [s]uch alleged contracts . . . will be given great weight [in determining whether a proposed rate increase is unreasonable] if the shipper demonstrates (1) that the par-

ties intended to be legally bound by the agreement; (2) that the shipper reasonably relied on the contract to its substantial detriment (*e.g.*, by making large capital investments that it would not otherwise have made); and (3) that public interest considerations warrant holding the carrier to the agreement.

*Policy Statement II, supra.*

As earlier described, less than a year after the ICC's second contract rate policy statement, Congress passed the Staggers Act, which, in Section 208(a) expressly authorizes carriers and shippers to enter into railroad transportation contracts, precludes Commission review of the reasonableness of rates set in authorized contracts, and provides that courts have exclusive jurisdiction to resolve disputes arising under such contracts. Nonetheless, and in face of the "grandfather" clause according pre-Staggers Act contracts the "same force and effect" as contracts made pursuant to the Act, the ICC has announced in its most recent contract rates statement that the Staggers Act has "*not* affect[ed] the Commission's jurisdiction, as it existed under prior law, to adjudicate disputes concerning the existence, lawfulness and effect of pre-Act contracts, subject, of course, to judicial review." *ICC Interpretive Statement, supra*, J.A. at 100 (emphasis in original). Stated more precisely, the Commission maintains that it is the proper forum of first instance to "adjudicate a dispute between a shipper and a carrier concerning the (1) existence or (2) the lawfulness of a pre-Act agreement," and that it "should continue to exercise such jurisdiction *exclusively*." *Id.* (emphasis added). *See also id.* at 102 ("disputes about the existence, validity and effect of pre-Act agreements should be adjudicated by the Commission in the first instance and not by the courts").

C. *History of the Burlington Northern Railroad Co.—Iowa Power and Light Co. rate dispute*

In 1976, petitioner Burlington Northern Railroad Co. (BN) and intervenor Iowa

---

**3.** This policy statement was further explained in a decision served April 10, 1979, published at

361 I.C.C. 205.

Power and Light Co. (IPL) signed a "letter of understanding" in contemplation of IPL's completion of a coal-fired generating plant at Council Bluffs, Iowa. The letter designated a base rate and a rate escalation formula for unit-train shipments of coal to Council Bluffs from a mine at Belle Ayr, Wyoming. BN was the only rail line serving the Wyoming mine from which IPL had contracted to purchase coal. Shipments commenced in 1978 and a few months thereafter BN submitted a tariff specifying a rate higher than the one initially agreed upon. On IPL's petition, the ICC eventually determined, in light of its contract rate policy, that the letter of understanding rate was a just and reasonable maximum. The Commission's prescription order, served on October 1, 1980, the effective date of the Staggers Act, directed BN to cancel the higher rate and to file tariffs consistent with the letter of understanding. *Unit-Train Rates on Coal—Burlington Northern, Inc.*, 364 I.C.C. 186 (1980).[4]

The Eighth Circuit denied BN's petition for review, holding, *inter alia*, that the alleged BN–IPL agreement was not illegal per se under the ICC's decisional law as it existed prior to the Commission's first (1978) statement of a contract rate policy, and that the 1976 letter of understanding was properly given evidentiary value in the ICC's maximum reasonable rate decision. *Iowa Power and Light Co. v. Burlington Northern, Inc.*, 647 F.2d 796, 807–09 (1981), cert. denied, —— U.S. ——, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982). As a threshold mat-

ter, the Eighth Circuit ruled that the Staggers Act was not applicable to the controversy in view of the extensive proceedings that had occurred before the effective date of the Act.[5] Accordingly, the court rejected BN's contention that the Commission lacked jurisdiction, by reason of Section 202 of the Act, to prescribe a rate that would result in a 123 percent revenue-to-variable cost ratio, a ratio substantially below the 160 percent market dominance threshold initially effective under Section 202. 647 F.2d at 802–07.

On October 12, 1981, several months after the Eighth Circuit's decision and just over a year after the Staggers Act became effective, BN again submitted a tariff proposing a rate higher than the rate authorized in the letter of understanding.[6] BN asserted that the proposed rate fell below the 165 percent threshold then effective under Section 202 of the Staggers Act and, on that account, requested the Commission to decline jurisdiction and to lift its 1980 rate prescription order. J.A. at 28.

In a letter to the ICC dated October 16, 1981, IPL petitioned for rejection of the tariff on the ground that it violated the Commission's outstanding rate prescription. J.A. at 47.[7] Less than two weeks later, IPL filed a breach of contract action against BN in the United States District Court for the Southern District of Iowa, *Iowa Power and Light Co. v. Burlington Northern Railroad Co.*, Civil No. 81–526–B (filed Oct. 27, 1981), seeking a declaratory judgment, injunctive relief, and damages. J.A. at 58. That suit is now in the discovery stage.

**4.** The ICC's decision was made upon reconsideration. The earlier proceedings, and a more detailed account of the initial stages of the BN–IPL controversy, are set out in *Iowa Power and Light Co. v. Burlington Northern, Inc.*, 647 F.2d 796, 801–02 (8th Cir. 1981), cert. denied, —— U.S. ——, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982).

**5.** Courts have uniformly held that proceedings of this character pending in the ICC or in court on the effective date of the Staggers Act are governed by the pre-Staggers Act regime. *Burlington Northern, Inc. v. United States*, 675 F.2d 1339 (D.C.Cir.1982) (per curiam); *Cleveland Cliffs Iron Co. v. ICC*, 664 F.2d 568, 587–91 (6th Cir. 1981); *Iowa Power*, 647 F.2d at 802–07. Retroactive application of the Act in

long-pending cases, the courts have reasoned, would waste private, administrative, and judicial resources by forcing parties, Commission, and court to consider anew matters already extensively litigated.

**6.** By late 1981, the escalated rate pursuant to the BN–IPL letter of understanding was $7.62 per net ton. The tariff BN submitted proposed a $10.95 rate.

**7.** IPL relied solely on the ICC's 1980 prescription order and took no position on BN's contention that Section 202 of the Staggers Act removed Commission jurisdiction over the reasonableness of the rate in question. J.A. at 49.

In an October 30, 1981, decision, the ICC rejected the rate increase BN proposed. It stated that BN should petition for an order lifting the 1980 rate prescription before proposing a higher tariff, and it asserted "continued jurisdiction to prescribe maximum reasonable rates, based on pre-Act agreements," even if the rates prescribed produce a revenue-to-variable cost ratio below the Section 202 market dominance threshold. The Commission referred to its November 1980 *Interpretive Statement, supra,* for explanation of its "rationale for retaining jurisdiction over pre-Act rate agreements in accordance with [its] contract rate policy." *Iowa Power and Light Co.—Petition for Rejection,* No. 38723, J.A. at 56.[8] The case is now before us on BN's petition for review.

## II. ANALYSIS

Clear brackets surround this controversy. Had all relevant events occurred after the October 1, 1980, effective date of the Staggers Act, the ICC, if it found that a proposed rate increase fell below the Section 202 market dominance threshold, would exhaust its oversight function; if the increase conflicted with a contract entered into under Section 208(a), a court, not the Commis-

sion, would be the forum to which the shipper could repair for relief. 49 U.S.C.A. § 10713(i)(2) (West·Supp. 1981). On the other hand, if the alleged rate contract and the proposed increase antedated October 1, 1980, and if proceedings to block the increase were well underway on that date, Staggers Act provisions would not govern, and the ICC would retain its pre-Act authority to consider the rate agreement in determining the reasonableness of the proposed increase. *Cleveland Cliffs Iron Co. v. ICC,* 664 F.2d 568, 587–91 (6th Cir. 1981); *Iowa Power,* 647 F.2d at 802–07.

The problem at hand, evanescent as it is,[9] falls between these brackets; the alleged rate contract antedated the Staggers Act, but the proposed increase occurred post-Act. Although the statutory text does not expressly address the transition period question that BN's review petition presents, we conclude that the paramount design of Congress to reduce the ICC's regulatory role,[10] and the clear legislative intent to place contract disputes in court, must direct the Commission's course. Accordingly, if the increase BN proposed in fact falls below the Section 202 threshold,[11] the ICC should accept the tariff and leave contract enforce-

---

**8.** On October 30, 1981, the very day the Commission released its decision, the District Court for the Southern District of Iowa, at IPL's request, issued a temporary restraining order barring BN from taking any action which "would result in an applicable rate different from the rate now being paid." J.A. at 91, 95. As IPL's complaint proposed, *id.* at 62, the temporary restraining order directed the establishment of an interest-bearing escrow account into which IPL was to pay the disputed monies. *Id.* at 95. Thereafter, at IPL's request and in light of the Commission's order rejecting the rate increase proposed by BN, the district court vacated the temporary restraining order. *Id.* at 96.

**9.** The ICC has noted that "very few" rate agreements applicable to current movements predate the Staggers Act. Brief for the Interstate Commerce Commission at 28 n.16.

**10.** Through passage of the Staggers Act, Congress sought "to minimize the need for Federal regulatory control over the rail transportation system." Section 101(a), 49 U.S.C.A. § 10101a(2) (West Supp. 1981). *See also* H.R. Rep.No.1430, 96th Cong., 2d Sess. 89 (1980),

U.S.Code Cong. & Admin.News 1980, p. 3978 (purpose of the Staggers Act was "to reverse the decline of the railroad industry, which has been caused, in part, by excessive government regulation").

**11.** The ICC asserts that "BN has not proved" that the rate it now proposes "produces a ratio of revenue to cost below that listed in Section 202 of the Act." However, for purposes of the Commission's response to BN's petition for review, the ICC assumes, *arguendo,* the accuracy of BN's contention that the proposed rate falls below the threshold. *See* Brief for the Interstate Commerce Commission at 11. Moreover, it is not genuinely disputed that the 1976 BN–IPL letter of understanding calls for a rate that is far below the Section 202 market dominance threshold. *See supra* p. 938. BN submitted a cost study to the Commission estimating the revenue-to-variable cost ratio under the rate in effect at the end of 1981 to be in the 114 percent range, in contrast to the 165 percent threshold then prescribed by Section 202. *See* J.A. at 21–22.

ment questions to the plenary authority of the district court in which IPL has filed suit against BN for breach of contract.

### A. *The outstanding prescription order*

■ As set out above, in a prescription order served on October 1, 1980, the Commission, following its pre-Staggers Act approach to contract rates, rejected a proposed rate increase BN tendered prior to the effective date of the Act. The prescription order sets as the maximum reasonable rate for the transportation in question the "per ton [rate] effective July 1, 1978, as escalated annually under the escalation formula found in the [1976] Letter of Agreement between Burlington Northern Inc. and Iowa Power and Light Company." *Unit-Train Rates on Coal*, 364 I.C.C. at 200. The ICC and intervenor IPL now maintain that the post-Act increase proposed by BN conflicts with the outstanding prescription order and that this court should dismiss BN's petition for review on that account without reaching other issues. We agree with BN that the prescription order does not impede this court from reviewing the Commission's assertion of authority to reject BN's tariff even if it falls below the Section 202 threshold.

First, the ICC and IPL incorrectly represent that BN "did not ask the Commission to vacate the 1980 prescription," but instead "ignore[d]" the outstanding order. Brief

for the Interstate Commerce Commission at 11; Brief of Intervenor at 6.[12] BN in fact asserted that the 1980 rate prescription, which was based on pre-Staggers Act law, could not continue in effect consistently with the new legal regime; for that reason, BN requested the Commission "to explicitly lift" the order. J.A. at 28. Therefore no procedural lapse on BN's part warrants peremptory dismissal of its review petition.

Second, it is inescapably obvious that the ICC's stance rests not on the form of BN's submissions, but upon the Commission's substantive determination that the Staggers Act does not preclude it from regulating the rate in question, even if the proposed increase is below the Section 202 market dominance threshold.[13] For if the Staggers Act has the effect BN urges, it would be wholly arbitrary and capricious, "not in accordance with law," and "in excess of [the Commission's] statutory jurisdiction," 5 U.S.C. § 706(2)(A), (C), for the ICC to refuse to vacate the outstanding rate prescription if BN has in fact proposed a rate below the market dominance threshold. We therefore turn to the question whether the Staggers Act preserves a regulatory role for the Commission permitting it to reject a tariff setting a rate below the Section 202 threshold and tendered after the effective date of the Act, if the proposed rate exceeds the rate specified in an alleged pre-Act contract.

---

**12.** Both briefs later indicate that these representations overstate the case. The Commission's second statement identifies the alleged infirmity as BN's failure to "seek a hearing to vacate the prior order before it filed a rate that violated the order." Brief for the Interstate Commerce Commission at 17. IPL concedes that BN "filed a pleading ... which included, at the very end, a request to the Commission to lift the prior rate orders ..., [but] the Commission has not done so." Brief of Intervenor at 9.

**13.** The ICC makes it plain that it would regard as irrelevant proof that the proposed rate falls below the Section 202 threshold. To succeed on a petition to lift the prescription order, according to the Commission, BN would have to demonstrate at a hearing that it "needs more revenue." Brief for the Interstate Commerce Commission at 17–18. The Commission relies on a passage in *Arizona Grocery Co. v. Atchison, T. & S.F. Ry.*, 284 U.S. 370, 387, 52 S.Ct.

183, 185, 76 L.Ed. 515 (1932), for its contention that the outstanding order must remain in place until BN establishes at a hearing its need for more revenue. But as BN correctly points out, *Arizona Grocery* "was decided at a time when the Commission had jurisdiction over *all* rates, not just those that exceeded a specified statutory threshold." Reply Brief at 10 (emphasis in original). Section 202 provides, as the ICC acknowledges, "that the Commission may not ... determine a rate's reasonableness if [the rate] produces revenue below a specified ratio of revenue to cost." Brief for the Interstate Commerce Commission at 25. Hence the *Arizona Grocery* passage would be in point today as to rates at or above the jurisdictional threshold of Section 202, but its instruction concerning a hearing to set a new rate in place of an outstanding maximum reasonable rate prescription cannot sensibly extend to rates the ICC can no longer inspect for reasonableness.

B. *Jurisdiction to enforce rate contracts*

Although Section 202 withdraws from the ICC jurisdiction to inspect for maximum reasonableness rates that fall below the specified threshold, the Commission maintains that Section 202 does not constrict its role in this case because Section 208(a), 49 U.S.C.A. § 10713 (West Supp. 1981), governing rate-setting contracts, preserves the Commission's pre-Act adjudicatory authority with respect to pre-Act agreements. As asserted in *ICC Interpretive Statement, supra*, J.A. at 100:

First, Section 10713(i)(2) provides that the "exclusive remedy for any alleged breach of a contract entered into *under this section* shall be an action in an appropriate State court or United States district court ...." (emphasis supplied). Pre-Act contracts were not "entered into under this section." Second, the grandfather provision, Section 10713(j), states that "(n)othing in this section shall affect the rights of the parties to challenge the existence of (a pre-Act) contract," but does not mandate that any such challenge be determined by the courts.

Third, although the foregoing textual analysis may not be conclusive on the issue of where adjudication is to take place, practical and equitable considerations require an interpretation that the Commission is the most appropriate forum in which to adjudicate such disputes ....

As to the Commission's "textual analysis," we agree essentially with the response of the Sixth Circuit in *Cleveland Cliffs* to similar argument. The Sixth Circuit pointed out that neither the Staggers Act nor indeed the ICC's pre-Act contract rate policy supports the notion that the Commission "can enforce a contract between a shipper and a carrier." 664 F.2d at 591. Prior to the Staggers Act, the ICC "contented itself to consider proof regarding the existence and content of [a contract] as merely evidence bearing on the reasonableness of rates being charged by a carrier." *Id.* at 591–92. But the pre-Staggers Act "rate reasonableness" foothold is not available to the Commission under the Act unless the carrier has "market dominance" over the transportation in question, and as the ICC concedes, Section 202 provides that the Commission may not find market dominance if the rate the carrier proposes will produce revenue below the specified revenue-to-variable cost level. Far from augmenting the ICC's authority over pre-Act agreements, and as the Sixth Circuit observed, Section 208(a) appears to "evince[ ] an ... intention that matters of contract dispute between shipper and carrier are to be decided by courts of law rather than by the ICC." *Id.* at 592.

With respect to post-Act contracts, Section 208(a) vests in the Commission largely ministerial responsibilities. Generally, the Commission is obliged to approve contracts filed with it unless it finds, on the complaint of a shipper not party to the contract, that the contract would impair the carrier's common carrier obligations to the complainant. 49 U.S.C.A. § 10713(d)(2)(A)(i) (West Supp. 1981).[14] Upon Commission approval of a contract filed under Section 208(a), the "exclusive remedy for any alleged breach" is a court action, not an ICC proceeding. 49 U.S.C.A. § 10713(i)(2) (West Supp. 1981). We cannot find in the Act's interstices, or in the slender legislative history in point,[15]

---

14. Neither this principal ground, nor any other ground on which Section 10713(d) permits the Commission to disapprove a contract is relevant here.

15. The legislative history of Section 208(a)'s grandfather clause, to which the ICC refers in its *Interpretive Statement, supra*, J.A. at 101, indicates only an intention to "preserve the rights of shippers arising out of [pre-Act] contracts" while safeguarding as well the position of railroads "whose very ability to serve could be impaired by inflexible contract enforce-

ment." 126 Cong. Rec. H10085–86 (daily ed. Sept. 30, 1980) (statement of Rep. Dingell); *see also id.* at H8606 (daily ed. Sept. 9, 1980) (statement of Rep. Dingell). In its *Interpretive Statement, supra*, the ICC underscored Rep. Dingell's expressed concerns for the plight of railroads. By contrast, in its brief to this court, the ICC stresses the same Representative's concerns to preserve the rights of public utility shippers. Brief for the Interstate Commerce Commission at 28–29.

any authorization for Commission rather than court contract issue adjudication in the case of pre-Act agreements. Contracts in force on the effective date of the Act "shall . . . have the same force and effect as if . . . entered into in accordance with the provisions of [Section 208(a)]." 49 U.S.C.A. § 10713(j) (West Supp. 1981). An unstrained reading of this stipulation, a reading faithful to the deregulatory thrust of the Act, indicates that contract rate disputes arising after October 1, 1980, are to be aired exclusively in court, whether the contract in question predated or postdated the Act.

Nor do we discern any practical or equitable reasons for allowing the Commission to adjudicate contract disputes in transition period cases such as this one.[16] The courts to which the Staggers Act has committed contract questions are adequately equipped to determine whether alleged agreements are in fact binding legal contracts and whether, in equity, relief from an agreement would be appropriate. *See Cleveland Cliffs,* 664 F.2d at 592. We do not share the ICC's apparent fear, *see ICC Interpretive Statement, supra,* J.A. at 102, that courts may hold parties to pre-Act contracts woodenly, in derogation of Congress' intent. Rather, we believe that, obedient to the command that "[n]othing in [Section 208(a)] shall affect the rights of the parties to challenge the existence of [a pre-Staggers Act contract]," 49 U.S.C.A. § 10713(j) (West Supp. 1981), courts will take into account the uncertain legal status of such agreements at the time they were made and the ICC's approach to them under its contract rate policy.

## CONCLUSION

For the reasons stated, we hold that, when a rate increase is tendered to the ICC

after the effective date of the Staggers Act and the tendered rate is allegedly below the Section 202 market dominance threshold, the Commission may not reject the rate simply because it is above the level specified in an outstanding prescription order or a pre-Act rate agreement. If the rate most recently proposed by BN is in fact below the Section 202 threshold, a matter the ICC has not yet addressed, the Commission must accept the tariff, and leave to the appropriate court, in this case, the United States District Court for the Southern District of Iowa, the question of any interim or final remedy for the breach of contract alleged by IPL.[17]

The petition for review is granted, the order on review is vacated, and the case is remanded to the Commission for further action consistent with this opinion.

*So ordered.*

---

**16.** In its *Interpretive Statement, supra,* J.A. at 100, the Commission identified as "practical and equitable considerations" the burden on parties and waste of administrative and judicial resources if disputes pending before the Commission on the effective date of the Staggers Act had to be dismissed. But it is now settled that disputes substantially aired prior to the

effective date of the Act are governed by pre-Staggers Act law. *See supra* note 5.

**17.** As the temporary restraining order initially issued by the district court suggests, *see supra* note 8, no Commission action was needed to "complement" the court's authority. *Cf.* Brief for the Interstate Commerce Commission at 33.