The **KANSAS POWER & LIGHT COMPANY, Plaintiff-Appellant,**

**State Corporation Commission of the State of Kansas, Intervening Plaintiff-Appellant,**

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, Defendant-Appellee.**

Nos. 82–2095, 82–2166 and 83–1277.

United States Court of Appeals, Tenth Circuit.

July 23, 1984.

John M. Cleary, Donelan, Cleary, Wood & Maser, P.C., Washington, D.C. (David S. Black, Senior Vice President-Law, John K. Rosenberg, Asst. Gen. Counsel, The Kan-

sas Power & Light Co., Topeka, Kan., and Nicholas J. DiMichael, Jade Alice Eaton and Roger K. Davis, Donelan, Cleary, Wood & Maser, P.C., Washington, D.C., with him on briefs), for plaintiff-appellant, Kansas Power and Light Co.

Brian J. Moline, Gen. Counsel, Dennis D. Ahlers, Asst. Gen. Counsel, Kansas Corp. Com'n, Topeka, Kan., on brief for intervening plaintiff-appellant, Kansas Corp. Com'n.

Betty J. Christian, Steptoe & Johnson, Chartered, Washington, D.C., and Thomas E. Deacy, Jr., Deacy & Deacy, Kansas City, Mo. (Martin D. Schneiderman and Charles G. Cole, Steptoe & Johnson, Chartered, Washington, D.C., and Edward W. Mullen and Patrick C. Cena, Deacy & Deacy, Kansas City, Mo., and Donald E. Engle and Nicholas P. Moros, St. Paul, Minn., of counsel, Burlington Northern R. Co., with them on brief), for defendant-appellee.

Herbert J. Martin and Frederick W. Claybrook, Jr., of Crowell & Moring, Washington, D.C., on brief for amici curiae, The Cleveland-Cliffs Iron Co., Jones & Laughlin Steel Corp., and Inland Steel Co.

Before SETH, Chief Judge, and DOYLE and SEYMOUR, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

## I. INTRODUCTION

This is an action which was instituted by The Kansas Power & Light Company (KPL). The allegation was that there was a breach of contract on the part of Burlington Northern Railroad Company. KPL sought a declaratory order that the parties had entered into an enforceable contract and a permanent injunction prohibiting BN from breaching the contract. The basic issue is whether a contract existed.

Burlington Northern (BN) denies that it entered into an enforceable contract with KPL, and thus, whether there was indeed a contract in effect is the basic issue here.

## II. THE RELEVANT FACTS

The facts are somewhat complex. In the early 1970's, KPL planned to build a new generating facility and commenced an arrangement for a supply of coal to power the new facility. Several sites were considered for both the facility and the supply of coal. However, in order to get the coal to the generating facility, KPL also began negotiating with carriers, including BN, for the transportation of the coal.

Following a meeting with representatives of BN, KPL sought from BN a schedule of rates that it would charge to transport coal from Wyoming to several sites in Kansas. BN responded by letter dated October 7, 1971. In that letter there were specified estimated rates. The parties continued discussions. On January 19, 1972, BN wrote to KPL once again regarding rates. This letter also outlined an escalation formula to increase the rate in the future. In addition, BN stated that "This proposal is contingent upon the utility entering into a long term contract of 20 or more years with coal producers on BN for the indicated coal requirements." Finally, BN wrote that the "rates quoted above are tendered with a time limit of six months from the date of this letter."

In November 1972, at the request of KPL, BN committed its position to writing. In a letter which is dated November 30, 1972, BN provided a letter to serve as "an outline of the intent and understanding that Burlington Northern, Inc. and Union Pacific Railroad Company have regarding movement of coal from Amax Coal Company Belle Ayr Mine * * * to Kansas Power & Light Company's proposed plant site * * *." It was specified by BN that the proposed rates were attached and that it intended to file those rates with the ICC in anticipation of a 1978 start-up date. It also contained an escalation formula. The letter was signed by a representative of BN.

KPL had plans for a new generating plant facility and these plans were carried out. Also it should be noted that KPL entered into a long-term contract with Amax for the purpose of having a supply of coal. In early 1976, BN informed KPL that it wished to increase its rates. In

order to carry this out it filed with the ICC a tariff in 1977 for the transportation of coal from Wyoming to Kansas. There is a dispute between the parties on whether the rates filed differed from those specified in the November 30, 1972 letter. In early 1981, BN again informed KPL that it planned to raise its rates. In October BN then filed a tariff with the ICC to raise its rates. However, the ICC rejected this effort. BN filed again in December 1981 and this time the ICC allowed the rate increase. It was then that KPL filed the present lawsuit.

## III. CONTENTIONS OF THE PARTIES

To clarify the issues we outline here the contentions of the parties.

KPL maintains that it had an enforceable contract with BN regarding the rates to be charged for the transportation of coal. KPL maintains that the November 30, 1972 letter provides the basis of its contract with BN.

BN contends that it never entered into a binding agreement with KPL. According to BN, no contract exists and sets forth the following reasons for this:

(1) Due to the statutory framework in existence in 1972 a contract for rates between it and KPL would have been illegal *per se.*

(2) The letter of November 30, 1972 was not an offer.

(3) Even if the letter of November 30, 1972 was an offer, KPL never accepted.

(4) Any purported contract between the parties is too vague to be enforced.

(5) Any agreement between the parties is in violation of the Kansas Statute of Frauds (§ 33–106) because that statute requires a writing for any agreement not capable of performance within one year.

(6) The statutory framework now in existence, the Staggers Rail Act of 1980, 49 U.S.C. 10101, *et seq.* has no application.

The trial court, 544 F.Supp. 1336, ruled in favor of BN and against KPL concluding that there was no enforceable agreement existing between the parties for the following reasons. First, it held that any contract between a shipper and a carrier was illegal *per se* in 1972. Second, the trial court found that no contract existed. This second portion was based on a number of factors: (1) because any contract would have been illegal *per se* in 1972, the parties could not have intended to be bound at that time; (2) there was no offer; (3) there was no acceptance; and, (4) the writings did not evidence what duration the contract had. Third, the trial court found that any agreement between the parties violated the Kansas Statute of Frauds which requires a writing for any agreement incapable of performance within one year. The final conclusion of the trial court was that although § 208 of the Staggers Rail Act of 1980, (49 U.S.C. § 10713) permits rate contracts between carriers and shippers, it had no application to the issues here for the reason that no contract existed between KPL and BN. KPL maintains that the district court erred in each of those findings, and so each of them will be considered.

## IV. ISSUES

A. DID THE TRIAL COURT ERR IN RULING THAT A RATE CONTRACT ENTERED INTO BY A CARRIER AND A SHIPPER WAS ILLEGAL PER SE IN 1972?

KPL argues that this ruling was in error. Our view is that KPL is right on this and that it was error for the trial court to finally conclude that any contract entered into between the parties would have been illegal *per se,* and unenforceable.

To fully understand this issue and this problem, it is necessary to discuss the framework governing carriers in the 1970's. It is well to examine the history of the present situation.

Prior to 1976, Congress had invested the ICC with the power to oversee the rates charged by railroads. The ICC required all

rates to be just and reasonable pursuant to its authority under the Interstate Commerce Act, 49 U.S.C. § 1(5), 15(1), (1970). *Burlington Northern R. Co.*, 679 F.2d 934 (D.C.Cir.1982). The year 1976 is important because it was in that period that Congress limited the ICC's authority over rate making via the Railroad Revitalization and Regulatory Reform Act of 1976. 49 U.S.C. § 1(5)(b) (1976). During this time both the ICC's policy on, and the legal status of contracts for rates, is not clear. There is some case law suggesting that a tariff filed with the ICC was the only means for a railroad to establish rates.

In 1978, however, the ICC announced that contract rates could be filed as tariffs and that contract rates would be approved on a case by case basis. *Railroad Contract Rates:* Policy Statement, Ex Parte No. 358–F, 43 Fed.Reg. 58, 189 (1978). It was not until two years later that the ICC issued another policy statement having to do with contract rates. "[T]he ICC declared that where no contract rate was filed but a shipper alleged that a proposed rate violated a private agreement between shipper and carrier, the Commission would take the alleged agreement into account as a factor, among others, bearing upon the reasonableness of the rate." *Burlington Northern R. Co., supra* at 937.

That same year Congress enacted the Staggers·Rail Act of 1980, which further limited the ICC's authority over rates. 49 U.S.C. 10101 *et seq.* This Act also expressly authorizes rate contracts between shippers and carriers and "precludes Commission review of the reasonableness of rates set in authorized contracts, and provides that courts have exclusive jurisdiction to resolve disputes arising under such contracts." *Id.* The Staggers Act in addition contains a "grandfather clause" which gives pre-Act contracts the same force and effect as contracts entered into after the Act and in accordance with it. 49 U.S.C. 10713(j).

The trial court here ruled that any contract alleged by KPL to have been entered into in 1972 was illegal *per se* under the statutory framework in existence at that time. The cases relied on by the trial court, such as, *Empire Petroleum Co. v. Sinclair Pipeline Co.*, 282 F.2d 913 (10th Cir.1960), had been decided prior to the enactment of the Staggers Act. In more recent decisions, federal courts have consistently held that while the legal status of pre-Staggers Act rate contracts was uncertain, such contracts were not illegal *per se. See Burlington Northern R. Co. v. I.C.C.*, 679 F.2d 934 (D.C.Cir.1982); *Cleveland Cliffs Iron Co. v. I.C.C.*, 664 F.2d 568 (6th Cir.1981); *Iowa Power and Light Co. v. Burlington Northern Inc.*, 647 F.2d 796 (8th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982), and *Cleveland Cliffs Iron v. Chicago & North Western Transportation Co.*, 581 F.Supp. 1144 (W.D.Mich.1984).

It could be said that the alleged contract was not illegal *per se.* However it does not automatically result in a finding, in any event, that the contract must be enforced pursuant to the Staggers Act. In *Iowa Power & Light Co. v. Burlington Northern Inc.*, 647 F.2d 796 (8th Cir.1981) *cert. denied*, 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982), the court noted in dicta that when the parties attempt to vary an approved tariff via a private agreement, and there is a conflict between the tariff and the contract rate, the tariff must prevail. The court had ruled that the Staggers Act did not apply because the proceedings had commenced prior to the effective date of the Act. *Id.* at 806. *Burlington Northern R. Co. v. I.C.C.*, 679 F.2d 934 (D.C.Cir.1982) is more on point here at least in terms of timing. The D.C. Circuit was reviewing the ICC's rejection of a proposed rate increase. In deciding the applicability of the Staggers Act, the D.C. Circuit reasoned that:

1. If the contract was entered into prior to the Staggers Act and the proposed rate increase preceded October 1, 1980 and if proceedings to block the increase were commenced prior to October 1, the Staggers Act would not govern.

2. If the contract was entered into and the proposed increase occurred after October 1, 1980, the Staggers Act would apply.

3. If however, the contract predates the Act but the proposed increase came after the Act, the "ICC should accept the tariff and leave contract enforcement questions to the plenary authority of the district court ...." *Id.* at 939.

Here, as in *Burlington Northern R. Co. v. I.C.C.*, 679 F.2d 934, the alleged contract predated the Staggers Act but the proposed increase at issue occurred after the effective date of the Act. Proceedings were not, therefore, well under way as of the effective date of the Act as they were in *Iowa Power & Light, supra.* Implicit in the *Burlington Northern R. Co. v. I.C.C.* holding that the breach of contract question is within the court's jurisdiction is the fact that a contract in conflict with a tariff can be enforced. The courts, not the ICC, in cases such as this, is the appropriate forum for determining the existence of an enforceable contract. "Nor do we discern any practical or equitable reasons for allowing the Commission to adjudicate contract disputes in transition period cases such as this one. The courts to which the Staggers Act has committed contract questions are adequately equipped to determine whether alleged agreements are in fact binding legal contracts and whether, in equity, relief from an agreement would be appropriate." *Burlington Northern R. Co.*, 679 F.2d at 942. "If the rate most recently proposed by BN is in fact below the Section 202 threshold, * * * the Commission must accept the tariff, and leave to the appropriate court, * * * the question of any interim or final remedy for the breach of contract alleged" by KPL. *Id.*[1]

This court therefore must find that if a contract exists, it was not illegal *per se,* and the court may grant a remedy for any breach of that contract by BN if the requirements of the Staggers Act are met.

## B. DID THE DISTRICT COURT ERR IN FINDING THAT NO CONTRACT EXISTED?

A number of factors were cited by the district court in support of its conclusion that no contract for rates existed between the parties. These must be considered and will be below.

### 1. *Intent to be Bound.*

The trial court, *citing Sidwell Oil & Gas Co., Inc. v. Loyd,* 230 Kan. 77, 630 P.2d 1107 (1981) correctly noted that the controlling question as to whether a binding agreement was entered into is the matter of intent of the parties. The trial court went on to find that there was no intent to be bound because the parties knew that a rate contract was illegal *per se.* As noted above, however, the alleged contract was not illegal *per se,* and the parties could have intended to be bound. Even if the contract was illegal when made, the language of the Staggers Act makes it clear that BN cannot raise illegality as an affirmative defense to the existence of a contract. *Cleveland-Cliffs Iron Co. v. Chicago & North Western Transportation Co.,* 581 F.Supp. 1144, 1151 (W.D.Mich.1984).

There is nothing novel or extraordinary in the passage of laws by the Federal Government and the States ratifying, confirming, validating, or curing defective contracts. Such statutes, usually designated as 'remedial,' 'curative,' or 'enabling,' merely remove legal obstacles and permit parties to carry out their contracts according to their own desires and intentions. Such statutes have validated transactions that were previously illegal relating to mortgages, deeds, bonds, and other contracts. Placing the stamp of legality on a contract voluntarily and fairly entered into by parties for their mutual advantage takes nothing away from either of them. No party who has made an illegal contract has a right to insist that it remain permanently illegal. Public policy cannot be made static by

---

**1.** The threshold of Section 202 refers to a quasi-     jurisdictional issue.

those who, for reasons of their own, make contracts beyond their legal powers. No person has a vested right to be permitted to evade contracts which he has illegally made.

*Cleveland-Cliffs Iron, supra,* at 1151, *quoting McNair v. Knott,* 302 U.S. 369, 372–373, 58 S.Ct. 245, 247–248, 82 L.Ed. 307 (1937). The asserted illegality of the contract does not, by itself, indicate that the parties did not intend to enter into a binding agreement.

Therefore, this court finds that BN's assertion that the parties could not have intended to be bound because any contract would have been illegal per se is wholly without merit.

### 2. *Offer*

In asserting the existence of a contract, KPL contends that a letter from BN, dated November 30, 1972, constitutes an offer. This letter provides, in part:

> This letter will serve as an outline of the intent and understanding that Burlington Northern Inc. and Union Pacific Railroad Company have regarding movement of coal from Amax Coal Company Belle Ayr mine at Belle Ayr, Wyoming to Kansas Power & Light Company's proposed plant site near Delia, Kansas. Routing of movement will be via Burlington Northern to the Hastings, Nebraska, interchange with the Union Pacific, thence Union Pacific to plant site near Delia, Kansas.
>
> Attached is Exhibit A, which shows proposed rates covering the transportation of coal by unit train from Belle Ayr, Wyoming to near Delia, Kansas. It is the intent of the carriers to file these rates with the Interstate Commerce Commission and to publish on statutory notice sufficiently in advance of the scheduled start-up date of movement which we understand to be 1978.
>
> \*   \*   \*   \*   \*   \*
>
> In addition to the proposed rates, attached as Exhibit B is memorandum of escalation outlining the method and pro-

cedures that will be used to escalate the rates included in Exhibit A.

The above letter was signed by an Assistant Vice-President and the Coal Traffic Manager for BN.

The holding of the trial court was that this letter did not constitute an offer. The trial court continued that the letter contained neither an explicit intent to enter into a bargain nor an implicit one. In the trial court's view, this letter was no more than BN's statement of the current point of the negotiations.

■ An offer is an expression of a willingness to enter into an agreement. An offer is an act that reasonably leads the offeree to believe that a power to create a contract has been conferred upon him. 1 A. Corbin, Corbin on Contracts, § 11 (1963).

The letter of November 30, 1972 appears to fit clearly within this definition. This is especially so when one considers the course of dealing within which this letter was sent. That BN did not intend to be bound by a price agreement is inconceivable to this court in light of prior correspondence between the parties. For example, in January 1972, BN sent a letter to KPL regarding unit train rates. In addition to specifying rates, this letter also indicated that "The rates quoted above are tendered with a time limit of six months from the date of this letter." It is said that no offer was made, but this certainly is inconsistent with the contention that there was no offer, because it is phrased in terms of an offer. Although it appears that this offer was not accepted by KPL and negotiations continued, this letter evidences a willingness to be bound.

On April 7, 1972, BN again wrote to KPL. KPL had requested a comparison of ex parte rate increases versus BN's proposed escalation formula. Ex parte rate increases are those requested by the carrier by way of a tariff filed with the ICC. The escalation formula was a means proposed by BN for increasing rates over an extended period of time. BN provided this information to KPL for the years 1967 to

1972. BN also urged KPL to note that the escalation formula resulted in lower rates than an ex parte increase. It should be noted that BN asserts on appeal that it never intended to be bound and that although it tried to reach an understanding with shippers so as to decrease rate litigation in front of the ICC, it was still perfectly free to make ex parte rate increases. This assertion is not persuasive. If BN really had no intent to be bound to its proposed rates and escalation formula and was still free to submit ex parte increases, we wonder why it would point out the advantages of the escalation formula to KPL. This involves lower rates.

There is also an internal BN memorandum dated August 7, 1972 which outlines a telephone conversation between Mr. Miller of KPL and Mr. Boyce of BN. From this memo there is an indication that Boyce told Miller "our escalation proposal was firm only for single line movements and we could not guarantee UP's concurrence in joining line destinations." Here again there is a clear indication of a willingness to be bound. On November 30, 1972, BN wrote the letter quoted above to KPL. In view of the correspondence prior to this letter, all of which manifests a willingness to enter into a binding agreement and the clear language of the letter itself, this letter of November 30, 1972 must be construed as an offer.

### 3. *Acceptance*

The next question is what is acceptance and whether it was present. The trial court found that even if the November 30, 1972 letter was an offer, there existed no acceptance of it.

KPL argues that it accepted the offer by one of two ways: (1) it entered into a long term coal contract and therefore finalized the decision to build a generating facility in Kansas, or, in the alternative, (2) by communicating its acceptance by a public speech given on March 6, 1972. The trial

court rejected both of these contentions. According to the trial court, KPL could not have regarded the November 30, 1972 letter as an offer which invited acceptance by public speech or commencement of construction of a power plant. The trial court also felt that because KPL had, on some other occasions, entered into long term contracts only after review of these contracts by its legal staff and board of directors and finalization into a single document, KPL could not have entered into a contract with BN in this less formal way.

We must find that the trial court erred in finding no acceptance. While an offeror may prescribe the method of acceptance, if no method is specified, an offeree may accept in any reasonable manner. 1 A. Corbin, Corbin on Contracts, § 88, (1963).

The letter of November 30, 1972, which this court finds to be an offer, did not specify the means of acceptance. Thus, KPL could accept it in any reasonable manner. The President of KPL, Mr. Jeffrey, gave a speech on March 6, 1973. This speech was attended by representatives of BN. A review of the transcript of Mr. Jeffrey's speech by a third party would not necessarily reveal that KPL had accepted BN's offer. The speech had no explicit references to KPL's acceptance of an offer from BN. It is not, however, the response of a third party that is of import to this court. This court must examine whether BN felt that it had a contract with KPL as a result of this speech. There is strong evidence that as of March 7, 1973, the day following Mr. Jeffrey's speech, BN felt it had a contract with KPL. On March 7, R.L. Merklin, then BN's Vice-President of Market Redevelopment,[2] wrote a memorandum to Mr. I.C. Ethington of BN. This memo indicates that copies were given to at least eight other persons. The language of this memo clearly indicates that on March 7, 1973 BN felt it had a contract with KPL. It reads:

2. Mr. Merklin was also Mr. Kryzer's supervisor. It was Mr. Kryzer who signed the November 30,

1972 letter to KPL.

Kansas Power & Light, Topeka, Kansas, confirmed to the Energy, Metallics & Chemicals profit center on March 6 of their firm intention to build four and possibly five 700 megawatt units near Belvue, Kansas. The first unit will go on stream in January, 1978 and additional units will be added every other year through 1985.

Coal will be supplied by Amax Coal Company from their mine near Gillette, Wyoming. *Transportation will be BN-Hastings-UP delivery.* Amax has committed 225,000,000 tons of coal. *Based on 1973 dollars, the BN's revenue in shipper cars for the 30 year term of the contract will be $479,250,000.*

It will be necessary to work out details of a car maintenance contract.

(Emphasis supplied.)

Based upon this memo of March 7, BN believed it had a contract with KPL. The language of this memo reflects no equivocation whatsoever. BN did not say it might provide the transportation or that it might earn millions of dollars. BN believed that it *would* be providing the transportation and that the agreement was definite enough for it to calculate the revenue it *would* receive.

Accordingly, it appears to this court that KPL accepted and that BN knew KPL had accepted.

4. *Specificity of the Contract.*

We now consider the specificity of the contract. The trial court noted that even if KPL intended Mr. Jeffrey's speech of March 6 to constitute acceptance, it was unclear what KPL accepted. The trial court found that the November 30, 1972 letter was silent on several points. It cited the absence of a duration term and the lack of any specification of the amount of coal it would be transporting. Neither of these, however, stand in the way of a formation of a contract in this case. BN believed that it *would* be providing the transportation and that the agreement was definite enough for it to calculate the revenue it *would* receive, the quantity of coal to be shipped as evidence of the lack of specificity. "It has been held that a binding contract may be reached even though there are matters remaining to be negotiated. 'Two persons may fully agree upon the terms of a contract knowing that there are other matters on which they have not agreed and on which they expect further negotiation. Such an expectation does not prevent the agreement already made from being an enforceable contract.'" *Care Display, Inc. v. Didde-Glaser, Inc.,* 225 Kan. 232, 589 P.2d 599, (1979), *citing Storts v. Martin E. Eby Construction Co.,* 217 Kan. 34, Syl. ¶ 2, 535 P.2d 908, 909 (1975). Hence, even if KPL and BN still expected to negotiate some terms, a binding contract regarding price would have been entered into.

On appeal, however, KPL asserts that the quantity and duration terms are sufficiently certain to enforce the contract. According to KPL, the agreement is a requirements contract and the duration is forty years, which is the same duration as its contract for coal with Amax.

The contention of KPL that this is a requirements contract is persuasive. Requirements contracts have long been held valid and enforceable in Kansas. *Miller v. Sirloin Stockade,* 224 Kan. 32, 578 P.2d 247 (1978); *City of Holton v. Kansas Power & Light Company,* 135 Kan. 58, 9 P.2d 675 (1932). In a typical requirements contract, a buyer agrees to buy all of the item it requires in good faith from the seller. *Miller, supra.*

BN argues that the contract is not a requirements one because the contract here neither obligates KPL to use BN's services nor does it provide that KPL must use BN for "all" of its requirements. Thus, BN's position is that KPL was not bound to ship any coal via BN, much less all of its coal and, therefore, the contract is unenforceable because KPL's promise is merely illusory.

However, the contract is not lacking in sufficiency with respect to terms of quantity. The November 30, 1972 letter refers

specifically to quantity. It provides for an incentive pricing system based on tonnage shipped. Also, this document states, "In those years when KP&L's coal requirements from Belle Ayr to Delia become less than 2,000,000, carriers will seek to amend the tariff to reduce the annual minimum tonnage requirement, but not less than 1,500,000 tons, to apply only in KP & L's cars."

There are authorities establishing that comparable quantity provisions are enforceable requirements. *See McLouth Steel Corp. v. Jewell Coal & Coke Co.,* 570 F.2d 594 (6th Cir.1978), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94. In the *McLouth* case, the contract provided that buyer would buy from seller what it required in excess of what it was already required to buy from another company. Also, the contract indicated the amount it was obligated to purchase from the other company and buyer's estimate of what it might require from seller. In finding this to be an enforceable requirements contract, the court of appeals noted that it had to look to the intent of the parties which was not to ascertain an exact amount of coke to be purchased but rather to have available the materials that the buyer required and that the seller wished to provide. Certainly this reasoning is applicable here. KPL required transportation for the coal and BN had the transportation. Neither party could foresee the exact amount of the coal to be shipped, but they had their own desires. For example, BN wanted KPL to ship as much as possible as evidenced by its offer of incentive pricing based on tonnage. From the letter of November 30, 1972, it is clear that BN was well aware that the amount of coal to be shipped would fluctuate. When one considers these facts, it would make no sense to read the contract as anything other than a requirements contract.

BN's argument against this being a requirements contract is that it does not provide that KPL must ship "all" of its coal via BN, but this must fail, also. Thus, in *McLouth, supra,* the court found it was an enforceable requirements contract even though the contract failed to specify that buyer would buy "all" of its requirements from seller. To require the use of the word "all" would add nothing to this situation where it was apparent that BN would have a very large cargo of coal.

The further contention of BN is that the contract lacked the word "all", and that as a result, KPL was free to use alternative means to ship the coal. "The agreement need not specifically require the buyer to forego other supply sources if the practical effect is the same." *Perington Wholesale, Inc. v. Burger King Corp.,* 631 F.2d 1369, 1374 (10th Cir.1979). BN maintains that alternative means exist here as evidenced by the fact that KPL explored the possibility of alternative methods of transportation. According to the facts relied on by BN, however, this did not occur until 1976 when BN indicated its wish to raise the price already agreed to.

▇ We are not saying that BN was totally at the whim of KPL regarding the shipment of coal. But in requirements contracts, which by their nature may not be explicit in quantity, courts will imply a promise that the buyer's requirements be in good faith. *Miller v. Sirloin Stockade,* 224 Kan. 32, 578 P.2d 247 (1978).[3]

The trial court also found that the contract contained no duration term. The court correctly noted that the letter of November 30 is silent as to duration. The court rejected KPL's argument that the duration of its contract with BN was for forty years, the length of KPL's contract with Amax because the November 30, 1972 letter does not make any reference to any contract between KPL and Amax. It should be noted, however, that the trial court erred in not looking beyond this docu-

**3.** It is this implied promise of good faith which resolves an additional contention of BN. BN asserts that under KPL's contract with Amax, Amax could supply coal from different locations which might be serviced by a carrier other than BN so KPL could ship via a different carrier. This would be subject to KPL's implied promise of good faith.

ment. The March 7 internal BN memorandum indicates that BN was under the impression that its contract with KPL was to run for 30 years. Therefore, at the time the contract was entered into, KPL felt it had a contract for forty years while BN believed it was for 30 years. While this is a ten year difference, it indicates that both parties contemplated a long term agreement. Thus, the parties manifested an intent to be bound over an extended period and the lack of the specific duration should not prevent contract formation. The fact that there are present matters that need to be worked out does not prevent the contract from being binding. It is sufficient here that they have a long-term contract for rates—the exact length of that contract is not a question that this court has to resolve, because that is not an issue.

## C. DID THE TRIAL COURT ERR IN FINDING THAT THE CONTRACT VIOLATED THE KANSAS STATUTE OF FRAUDS?

■ Our conclusion is that the trial court did err in finding that any contract would violate the Kansas Statute of Frauds, KSA § 33–106; this requires that a contract not capable of performance within one year be in writing. The trial court held that the memoranda introduced by KPL was insufficient to satisfy the Kansas standard that the writing be complete, leaving nothing to rest in parol. The trial court viewed the documents as not evidencing the necessary certainty as to the material terms and conditions of the contract.

It would appear, however, that the trial court was concerned about the duration of any contract between the parties. It does appear, however, that the letter of November 30, 1972, from BN to KPL satisfies most of the requirements of the statute. True, this letter is not explicit regarding the terms of the agreement; however, the duration can be ascertained from the numerous writings of the parties. It is to be noted that there can be a compliance with the statute of frauds as the result of the consideration of more than one writing.

"The memorandum may consist of several writings if one of the writings is signed and the writings in the circumstances clearly indicate that they relate to the same transaction." Restatement (Second) of Contracts, § 132 (1979). The Comment under this Section explains that "A memorandum of a contract need only give assurance that the contract enforced was in fact made and provide evidence of its terms. It may consist of several separate documents, even though not all of them are signed and even though no one of them is itself a sufficient memorandum." Id.

■ We note also that the purpose of the Statute of Frauds is to prevent fraud and it ought not to be used as a means to allow persons who have made a promise to circumvent their obligations. "It is this fact that has caused the courts to interpret the statute so narrowly * * *." 2 A. Corbin, Corbin on Contracts § 275 (1950).

## D. REQUIREMENTS OF THE STAGGERS ACT

■ We address now the trial court's ruling that § 208 of the Staggers Act, the "grandfather clause," had no applicability to the issues of this case. This section of the Act provides:

The provisions of this section shall not affect the status of any *lawful contract* between a rail carrier and one or more purchasers of rail service that is in effect on the effective date of the Staggers Rail Act of 1980. Any such contract shall hereafter have the same force and effect as if it had been entered into in accordance with the provisions of this section. Nothing in this section shall effect the rights of the parties to challenge the existence of such a contract.

49 U.S.C. § 10713(j) (emphasis added).

The trial court found that this provision could not be used to enforce any contract here because the Act required that the contract shall have been a "lawful contract." According to the trial court, a "lawful contract" was one that had been filed with the ICC. Apparently the trial court felt that as contracts entered into

after the Staggers Act must be filed with the ICC, contracts entered into prior to the Act must also have been filed with the ICC in order to be enforced under the ambit of the "grandfather clause." The contract at issue here was not filed with the ICC and therefore the trial court found that even if a contract existed, it could not be enforced as a "lawful contract" under the Staggers Act.

A review of the legislative history reveals no support for the trial court's interpretation of the term "lawful contract."

The language of the grandfather clause itself persuades this court that contracts entered into prior to the passage of the Staggers Act need not have been filed with the ICC in order to be enforced. The grandfather clause of Section 208 specifies that *contracts entered into prior to the Staggers Act will have the same force and effect as those entered into in accordance with the provisions of this section.* The majority of Section 208 deals with the filing of contracts entered into after the effective date of the Act.

Accordingly, it appears that the clear meaning of the "grandfather clause" is that pre-Act contracts will have the same force and effect *as if* they were post-Act contracts in compliance with the filing requirements of § 208. Pre-Act contracts need not be filed to be enforceable.

This interpretation is consistent with the decisions of other federal courts. While no court of appeals has explicitly ruled on this question, two cases suggest that contracts entered into prior to the Staggers Act need not be filed with the ICC. *See Burlington Northern R. Co. v. I.C.C.,* 679 F.2d 934, 939 (D.C.Cir.1982) (where contract was entered into before Act but rate increase occurred post-Act, ICC should accept the tariff and leave contract enforcement questions to the court) and *Cleveland-Cliffs Iron Co. v. I.C.C.,* 664 F.2d 568, 588 (6th Cir.1981) ("Finally, subsection 10713(j) * * deals with contracts that do not technically fall under § 208's filing requirement because they were entered into prior to the effective date of the Staggers Rail Act.

The section provides that such contracts have the same effect as do those entered into in accordance with the section.") This issue was also addressed in *Cleveland Cliffs Iron Co. v. Chicago & North Western,* 553 F.Supp. 371 (W.D.Mich.1982). In that case, the shipper brought a breach of contract action against the carrier. The parties had entered into a rate contract in 1969 and the plaintiff sought damages and a declaration that the defendant had overcharged in violation of their agreement. The plaintiff was only attempting to enforce the contract; it was not challenging the reasonableness or unlawfulness of any rates filed via tariffs with the ICC. The holding of the trial court was that "The rates at issue in this case were in effect on the effective date of the Staggers Act. The lawfulness of these rates is not challenged in this proceeding. Therefore, the contract is not subject to the filing requirements of section 208(b) * * *."

\*       \*       \*       \*       \*       \*

The conclusions of this court are that:

1. The 1972 contract for rates was not considered illegal *per se.* Its benefits were enjoyed fully by BN. The law on this question is clear and there is no legal justification for BN's contention that a rate contract entered into in 1972 was illegal. This court cannot allow a party who willingly enters into a contract it feels to be illegal to accept its benefits and then seek escape from it when it is expedient to do so on the claim that the contract was illegal.

2. The parties entered into a binding agreement. All of the elements of contract formation are present. BN cannot, by arguing contract formalities, escape its contractual obligations in order to realize higher rates.

3. The agreement is enforceable pursuant to § 208 of the Staggers Act.

Accordingly, the judgment of the district court is reversed and the trial court is directed to make findings in accordance with this opinion, and to enter judgment in

favor of the enforceability of the agreement.[4]

---

**4.** Because of these findings, we need not deal with KPL's motion for new trial based on newly discovered evidence.