**BURLINGTON NORTHERN RAILROAD COMPANY, and Kansas City Southern Railway Company, Plaintiffs-Appellees,**

v.

**PUBLIC UTILITY COMMISSION OF TEXAS, Defendant-Appellant.**

No. 86–1463.

United States Court of Appeals, Fifth Circuit.

March 12, 1987.

Rehearing and Rehearing En Banc Denied April 8, 1987.

Steven Baron, Stephen J. Davis, Asst. Attys. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for defendant-appellant.

Phyllis B. Schunck, Austin, Tex., for plaintiffs-appellees.

Before REAVLEY and RANDALL, Circuit Judges, and MAHON *, District Judge.

REAVLEY, Circuit Judge:

The Public Utility Commission of Texas (PUC) wishes to make public disclosure of rail contracts entered into by the utility companies it regulates. The railroads object, claiming federal law preempts the PUC's ability to do so. The district court agreed with the railroads and entered summary judgment in their favor. We reverse.

I

The PUC is charged with regulating the rates and services of utilities in Texas. Tex.Rev.Civ.Stat.Ann. art. 1446c (Vernon Supp.1986). As part of its responsibility, the PUC conducts hearings on the reasonableness of the utilities' rates. The controversy in this case arises out of rate proceedings before the PUC involving the Gulf States Utility Company (GSU). In those proceedings, the PUC ordered GSU to provide the commission and the parties to the case copies of its contract with Burlington Northern Railroad Company and Kansas City Southern Railway Company. The contract was for the shipment of coal from Montana to GSU's facilities in Louisiana.

Initially, the contract was withheld from public disclosure under a PUC protective order. Subsequently, however, the PUC lifted the protective order. The PUC argues that public disclosure of the contract is necessary to facilitate public involvement in determining the reasonableness of the proposed rates. The railroads responded with this lawsuit, seeking declaratory and injunctive relief prohibiting public disclo-sure of their contract. In addition to the federal preemption ground ultimately relied on by the district court, the railroads asserted several state law theories to support the relief they claimed.

The district court granted a temporary restraining order against the threatened disclosure. This order was extended by agreement of the parties pending a final decision on the merits. Both parties then moved for judgment. The district court granted the railroads' motion, concluding that public disclosure of the contract conflicted with Congress's intent in enacting the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat.1895 (codified at scattered sections of 11, 45 and 49 U.S.C.), and was thus precluded by that act. 637 F.Supp. 584. The court thus permanently enjoined the PUC from taking any action that would result in public disclosure of the contract. The court did not reach any of the state law grounds asserted in the railroads' complaint.[1] The PUC appeals.

II

This court has previously considered Congress's intent in enacting the Staggers Act. See Texas v. United States, 730 F.2d 339 (5th Cir.), cert. denied, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984) (Texas I); Texas v. United States, 730 F.2d 409 (5th Cir.1984), modified on reh'g, 749 F.2d 1144 (5th Cir.), cert. denied, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 642 (1985) (Texas II). As we noted in Texas I, "[t]he Staggers Act is an attempt to revitalize the nation's railroad system by substantially deregulating rate-setting for interstate rail carriers." 730 F.2d at 344. Under previous law, all rates charged by carriers within the jurisdiction of the Interstate Commerce Commission (ICC) had to be approved as "just and reasonable." In 1976, Congress enacted the Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act), Pub.L. No. 94–210, 90 Stat. 31, which restricted ICC review to those cases

---

* District Judge of the Northern District of Texas, sitting by designation.

1. Those grounds have also not been argued before this court on appeal.

in which the commission determined that the carrier had. "market dominance." By 1980, however, Congress determined that the 4R Act did not go far enough. Congress felt that the railroads were still burdened by overregulation and that this was a major cause of the industry's financial difficulties. H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 89, *reprinted in* 1980 U.S. Code Cong. & Admin.News 3978, 4110, 4120.

Congress thus enacted the Staggers Act to speed along the deregulation process. Under the Staggers Act, railroads are given even greater freedom from ICC rate review. Although carriers with market dominance must still establish that their rates are reasonable, 49 U.S.C. § 10701a(b)(1), application of that concept is changed so as to free more traffic from regulation, *id.* § 10709(d). In addition, certain rate increases are placed in a zone of flexibility that protects them to a degree from reasonability challenges. *Id.* § 10707a. Congress also acted to reduce the burdens of state regulation on the railways. Whereas under prior law states were given substantial leeway in regulating intrastate rates, *see generally Texas I*, 730 F.2d at 345–46, under the Staggers Act a state may so regulate only when it has received ICC certification that its standards and procedures are consistent with those of federal law, 49 U.S.C. § 11501(b). Moreover, even after certification, state regulatory decisions are subject to review by the ICC for conformity to federal law. *Id.* § 11501(c). In short, the Staggers Act "is in nature a preemptive statute" and "[i]f a state wishes to continue regulating, it must do so in accordance with federal policy." *Texas I*, 730 F.2d at 347.

In *Texas I*, we considered a challenge by the state of Texas to the validity of various provisions of the Staggers Act. We affirmed that the act does, in fact, preempt inconsistent state regulation of railways. 730 F.2d at 345–46. We further held that this preemption was not invalid under the commerce clause, the Tenth Amendment, or the guaranty clause of the United States Constitution. *Id.* at 348–58.

In *Texas II*, we considered Texas's contentions regarding the scope of Staggers Act provisions relating to rail contracts. For many years, the ICC had interpreted existing law as prohibiting any rail contracts between shippers and carriers. *See* S.Rep. No. 470, 96th Cong., 1st Sess. 24 (1979). Congress, however, believed that contracts offer "great potential benefits to both carriers and shippers" because they give "the railroads assured levels of revenues and assure shippers of specified levels of service at known rates." *Id.* Accordingly, the Staggers Act explicitly permits rail contracts and gives the ICC jurisdiction to disapprove of them only within narrow time limits and on specified grounds. *See* 49 U.S.C. § 10713. The Act further provides that contracts are to be filed with the ICC and that the ICC is to make the "essential terms" of the contract available to the general public. *Id.* § 10713(b).

The basis of Texas's complaint in *Texas II* was an ICC ruling that the Texas Railroad Commission could not require, as a condition for approval of an intrastate tariff, that the railroad publicly disclose the rate to be charged under its contract. Texas argued that the rate was an essential term of the contract under section 10713(b) and thus had to be published. We upheld the ICC's determination to the contrary. Relying on the Second Circuit's decision in *Water Transport Association v. ICC*, 722 F.2d 1025 (2d Cir.1983), we concluded that the ICC's determination that the purposes of the Staggers Act did not require disclosure of the price terms was a reasonable one. We noted that the statute left it up to the ICC to determine which contract terms were "essential" and that this determination was to be made by balancing the need to provide sufficient information for those with standing to challenge the contract against the need to protect the confidentiality of the contract. We upheld the ICC ruling as consistent with the statute. Partially as a result of its insistence on disclosing more contract terms than ICC regulations permit, the Texas Railroad Commission was decertified as a rail regulator. *See Railroad Commission v. United*

*States,* 765 F.2d 221 (D.C.Cir.1985) (affirming decertification).

## III

The railroads' argument in favor of the district court's ruling that the PUC cannot publish their contract relies principally on the cases just described. The railroads assert that *Texas I* and *Texas II* establish that no state regulatory agency has authority to require publication of any rail contract in any context. They argue that to hold otherwise would undermine the decisions in those cases. It would be illogical, they assert, to allow the PUC to publish the very same contracts that we have ruled the Texas Railroad Commission may not publish. The railroads also argue, beyond reliance on prior case law, that the Staggers Act embodies a congressional policy to protect the confidentiality of contracts in order to encourage rate contracting and thereby foster competition. This policy is broad enough, they argue, to protect rail contracts from public disclosure in this case even though the utilities' contracts with other suppliers are not so protected.

In evaluating the railroads' argument, we rely on the well-settled principles of preemption:

Federal law may pre-empt state law in any of three ways. First, in enacting the federal law, Congress may explicitly define the extent to which it intends to pre-empt state law. Second, even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case states must leave all regulatory activity in that area to the Federal Government. Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Michigan Canners and Freezers Association v. Agricultural Marketing and Bargaining Board,* 467 U.S. 461, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984) (citations omitted). "In undertaking this analysis ... we must be mindful of the principle that 'federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *R.J. Reynolds Tobacco Co. v. Durham County,* —— U.S. ——, 107 S.Ct. 499, 507, 93 L.Ed.2d 499 (1986) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)).

█ At the outset, we reject any contention that Congress has preempted disclosure of the contract in this case by explicitly displacing the regulatory authority of the PUC. The Staggers Act certainly does not explicitly prohibit disclosure of rail contracts by regulatory bodies such as the PUC. In contrast to the express provisions relating to state regulation of railroads, the Staggers Act is completely silent as to activities of other state regulatory bodies that may have indirect effects on railroads. The railroads nonetheless argue that the Staggers Act prohibition on full disclosure of rail contracts by the ICC and by state rail regulators necessarily extends to all regulatory bodies. In making this argument, the railroads rely on language in our prior opinions to the effect that "Congress intended the Staggers Act to preempt state law." *See Texas I,* 730 F.2d at 347. In particular, the railroads place great stock in our statement in *Texas II* that Congress intended to "preempt general state authority over disclosure of contract terms." 730 F.2d at 419. In essence, the railroads urge us to read our prior cases as establishing broad preemption of any exercise of state authority that results in publication of rail contracts.

We, of course, agree that the Staggers Act is "in nature a preemptive statute." *Texas I,* 730 F.2d at 347. The act expressly prohibits any state regulation of railroads that is inconsistent with federal standards.

This prohibition extends to disclosure of rail contract terms. Our holdings in *Texas I* and *Texas II* establishing these principles, however, are not dispositive of the issue in this case. Our statements in those cases were made in regard to state regulation of railroads—specifically, regulation by the Texas Railroad Commission. We reached the unsurprising conclusion that when Congress mandates that states regulate railroads in conformity with federal standards, the Texas Railroad Commission is not free to adopt its own regulatory standards over railroads inconsistent with federal law. We had no occasion to consider the question in this case: whether a state regulator of electric companies is prohibited from taking action that results in public access to rail contracts. Nor does our conclusion in *Texas I* and *Texas II* necessarily decide the issue here. *Texas I* and *Texas II* relied primarily on explicit statutory and regulatory language. Because no such language exists in this case, we must independently determine whether Congress implicitly precluded disclosure of rail contracts as an incident to state utility regulation or whether such disclosure interferes with the full accomplishment of congressional objectives.

■ In attempting to show such a conflict between congressional intent and the PUC's action, the railroads argue that it would not make any sense to allow the PUC to publish the same contracts that the railroad commission cannot publish. Congress intended that rail contracts be kept confidential, they argue, and that intent is contravened whether the disclosure is done by the railroad commission or by the PUC. We might be persuaded by this argument if, in fact, Congress had manifested such a broad intent to protect the confidentiality of rail contracts. We conclude, however, that Congress's intent was much more narrow.

As discussed earlier, the Staggers Act explicitly authorizes railroads to enter into contracts. Congress intended this use of contracts to be "a significant aspect of the new freedom allowed to carriers to market rail transportation more efficiently." H.R.

Conf.Rep. No. 1430, 96th Cong., 2d Sess. 100, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4110, 4132. Accordingly, Congress narrowly limited the grounds on which the ICC may disapprove a rail contract. For most contracts, disapproval is allowed only if the contract impairs the railroad's common carrier obligation to a shipper or if the contract will result in unreasonable discrimination against a port. 49 U.S.C. § 10713(d)(2)(A). In addition, contracts for the transportation of agricultural products may be disapproved if the railroad has unreasonably discriminated against a shipper or if the contract constitutes a destructive trade practice. *Id.* § 10713(d)(2)(B). The ICC has thirty days from the date a contract is filed to initiate a review and another thirty days to make a determination. *Id.* § 10713(d)(1), (d)(3)(A). Once a contract is approved, it may not subsequently be challenged under the Interstate Commerce Act and any remedy for its breach is an action in court. *Id.* § 10713(i).

To facilitate challenges to rail contracts, the statute requires that all contracts be filed with the ICC. *Id.* § 10713(b). The ICC is then required to publish "the essential terms of the contract." *Id.* Although Congress did not explain why it chose to limit public disclosure to less than the entire contract, its intent is easily derived from the purposes of the Staggers Act. Congress felt that the rail industry had been overburdened by regulation and that the way to improve the industry's financial situation is to "allow the forces of the marketplace to regulate rail rates whenever possible." H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 89, *Reprinted in* 1980 U.S. Code Cong. & Admin.News 4110, 4120. Accordingly, the act is to be construed as "the first step toward treating the American railroad industry as any other business." 126 Cong.Rec. 28,431 (1980) (statement of Rep. Staggers). The contract provisions of the Staggers Act are, of course, central to this intent to treat the rail industry as any other unregulated industry. *See Texas II*, 730 F.2d at 419 ("Among the goals of the Staggers Act ... [was] allowing rail carriers to emulate, at least to

some degree, the contractual relationships of unregulated businesses.").

In this context, Congress's determination to require only limited disclosure is unsurprising. As the Second Circuit recognized, "contracts generally are confidential and, absent a specific legislative purpose, there is no reason to treat rail contracts differently." *Water Transport Association v. ICC*, 722 F.2d 1025, 1032 (2d Cir.1983). The ICC has reached a similar conclusion. *See Railroad Transportation Contracts*, 367 I.C.C. 9, 24 (1982) ("There is general recognition that contracts are private agreements among parties, and that, absent an overriding legislative mandate, should not be made public."). Congress's decision to require that the ICC disclose only the "essential terms" of rail contracts is simply a recognition that such limited disclosure is sufficient to serve the remaining regulatory purposes of the ICC and that any greater disclosure would unduly infringe on the private nature of the agreement. In returning the rail industry to the marketplace, Congress thus attempted, as much as possible, "to permit the purchasers of transportation and the railroads a degree of confidentiality similar to that of other businesses throughout the country." *Id.* at 25.

We do not find this legislative history to support the railroads' position in this case. Contrary to the railroads' suggestion, Congress has not given the railroads a statutory right to maintain the secrecy of their contracts. It has merely determined that in the context of rail regulation, only a limited amount of disclosure is required. Beyond that, it has concluded that rail contracts should be treated as other contracts generally. We do not find in the Staggers Act a special protection for rail contracts that is not available to contracts of other unregulated businesses. We believe that Congress intended to stimulate the rail industry by deregulating it, not that it enact-

ed protective legislation against nondiscriminatory hazards the railroads might encounter in a deregulated world.

To be sure, Congress's intent in deregulating was to stimulate competition and competition is stimulated when parties can reach confidential agreements. *See Water Transport*, 722 F.2d at 1032. To adopt the railroads' position, however, would go beyond the limited means chosen by Congress to reach its goals. In contrast to Congress's clear intent to remove those obstacles to rail competition imposed as part of federal and state regulation of railroads, we find no indication that Congress intended to remove all barriers to competition that may exist as a result of imperfections in the marketplace or because of regulation of entities with whom the railroads do business. In addition to the interests of the PUC, we note that other entities such as courts and securities regulators may have an interest in permitting public access to rail contracts. We do not believe that Congress, by enacting a statute to speed deregulation of the railroads, implicitly intended to preempt the activities of these entities by extending a blanket protection to rail contracts.[2]

We conclude that full effect can be given to congressional intent by holding, as we did in *Texas II*, that states are required by the Staggers Act to follow federal standards—including protecting the confidentiality of rail contracts—when regulating railroads. We find no warrant for holding that Congress intended to protect the railroads from the incidental effects of state regulation of entities with whom the railroads do business.[3]

REVERSED AND REMANDED.

---

**2.** Of course, even in these contexts, public disclosure of the contracts might be prevented by trade secrets or competitive practices laws. Our point is simply that the Staggers Act does not prevent disclosure and that Congress did not adopt such procompetitive laws as part of the Staggers Act.

**3.** We note that there is nothing in the record to suggest any intent on the part of the PUC to do anything other than engage in the legitimate regulation of utility companies. We thus find no support for the railroad's suggestion that the PUC is acting as a proxy rail regulator for the decertified Texas Railroad Commission.