**Leroy H. RENO, Jr., Administrator of the Estates of Brandon Hungerford and Ryan Hungerford, Both Deceased, Plaintiff,**

v.

**CONSOLIDATED RAIL CORP., Defendant.**

**No. IP91–309C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 8, 1992.

Earl C. Townsend, III, Townsend & Townsend, Indianapolis, Ind., for plaintiff.

Victor Frost, II, Frost & Hugon, Indianapolis, Ind., for defendant.

BARKER, District Judge.

On July 7, 1989, Brandon and Ryan Hungerford were passengers in a southbound vehicle which collided with a westbound train operated by defendant Consolidated Rail Corporation ("Conrail") at the Swain Street railroad grade crossing in Ingalls, Indiana, at approximately 6:16 p.m. Both

---

Brandon and Ryan were killed in this collision.

Plaintiff Leroy H. Reno, Jr., as administrator of their estates, has brought suit against Conrail, alleging that the defendant was "negligent, careless, wanton and willfull [sic]" in failing to warn the driver of the vehicle of the ultrahazardous condition of the Swain Street crossing, in failing to install automatic signal lights and automatic gates, in failing to order its employees to reduce speed through the Swain Street crossing, in failing to sound a horn to warn approaching traffic, and in failing to maintain an unobstructed eastward view along the tracks. Complaint for Damages, para. 5.

The Swain Street crossing was numbered for an inventory and apparently surveyed by the Indiana Department of Highways (now known as the Indiana Department of Transportation) ("the Department") in 1975 and then surveyed again in 1985. Although the Department makes a priority list of all railroad crossings in need of improvements (including roadway warning devices), the Swain Street crossing was not on this list between the time of its inclusion in the inventory and July 7, 1989. During this time period, the Department did not make any determination that the Swain Street crossing was in need of any roadway warning device beyond what presently existed. Affidavit of A. Fred Hohl, pp. 3–4.

Currently before the court is the Motion for Partial Summary Judgment of Defendant Consolidated Rail Corporation. The Plaintiff's Request for Oral Argument Upon Defendant's Motion for Partial Summary Judgment is denied because the court finds that it would not aid in the resolution of the purely legal issues presented by the defendant's motion.

The defendant's motion for partial summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

The defendant advances its motion based on the argument that the plaintiff's claims with respect to the need for additional grade crossing and/or traffic control devices and the failure to close the crossing (a claim advanced in the plaintiff's contentions filed November 1, 1991) are preempted by the Federal Railroad Safety Act of 1970 ("FRSA"), 45 U.S.C. § 421 *et seq.*

"[S]tate law is pre-empted under the Supremacy Clause, U.S. Const. Art. VI, cl. 2, in three circumstances." *English v. General Elec. Co.*, 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Conrail argues that one such circumstance applies here: "Congress can define explicitly the extent to which its enactments pre-empt state law." *Id.* "The question, at bottom, is one of statutory intent, and we accordingly 'begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Morales v. Trans World Airlines, Inc.*, —— U.S. ——, 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157 (1992) (quoting *FMC Corp. v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990)).

Congress enacted the FRSA "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons and to reduce damage to property caused by accidents involving any carrier of hazardous materials." 45 U.S.C. § 421. To accomplish this goal, Congress ordered the Secretary of Transportation ("the Secretary") to make "a comprehensive study of the problem of eliminating and protecting railroad grade crossings" and to "undertake a coordinated effort toward the objective of developing and implementing solutions to the grade crossing problem . . . ." 45 U.S.C. § 433. Moreover, the Secretary was directed to "(1) prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety supplementing provisions of law and regulations in effect on October 16, 1970, and (2) conduct, as necessary, research, development, testing, evaluation, and training for all areas of railroad safe-

ty." 45 U.S.C. § 431. The Secretary was directed to achieve this goal "insofar as practicable, under the authority provided by this subchapter and pursuant to his authority over highway, traffic, and motor vehicle safety, and highway construction. . . ." 45 U.S.C. § 433(b).

Conrail argues that the plaintiff's claims with respect to the need for additional grade crossing and/or traffic control devices and the failure to close the crossing are expressly and strictly preempted by 45 U.S.C. § 434, which provides:

> The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

Working from the language of the statute, Congress' intent to preempt state law relating to railroad safety is clear: state laws concerning this subject matter remain in force "until such time" as the Secretary has, under one of the sources of authority listed in section 433(b), adopted a rule, regulation, order or standard covering the same subject matter.

Conrail argues that the Secretary adopted such standards in the form of the Manual on Uniform Traffic Control Devices for Streets and Highways ("MUTCD"), 23 C.F.R. § 655.601(a), as "the national standard for all traffic control devices installed on any . . . highway," 23 C.F.R. § 655.-603(a), specifically to be applied to the improvement of traffic control devices at

grade crossings. 23 C.F.R. 646.214(b).[1] Part VIII of the MUTCD deals with "Traffic Control Systems for Railroad–Highway Crossings." Section 8A–1 of this part of the MUTCD provides in part that "[t]he determination of need and selection of devices at a grade crossing is made by the public agency with jurisdictional authority." Likewise, section 8D–1 provides that "[t]he selection of traffic control devices at a grade crossing is determined by public agencies having jurisdiction responsibility at specific locations." Conrail maintains that, by virtue of the adoption of the MUTCD, railroads are absolved of responsibility for determining the need for traffic control devices in favor of local authorities and that the standards dictated by the MUTCD have been substituted for common law duties previously imposed on railroads.

The plaintiff does not contest that the MUTCD covers the same subject matter as the state common law claims which he asserts, or that the local safety hazard exception should apply. Instead, the plaintiff contends that the MUTCD did not set forth safety standards and did not absolve Conrail of its duty under Indiana law to maintain safe railroad crossings, and that to find preemption in this case would not further the safety goals of the FRSA.

■■ Before considering the plaintiff's arguments on the preemption issue, however, the court will address the plaintiff's argument that this court strike the Affidavit of A. Fred Hohl (which was helpful but not essential to the court in reaching its ruling) because the affidavit allegedly contains assertions not based on Hohl's personal knowledge and because it contains legal conclusions. Hohl is the Highway–Railroad Manager for the Division of Design of the Indiana Department of Transportation. Reno contends that, despite Hohl's profession of personal knowledge in paragraph one of the affidavit, Hohl lacks personal knowledge as to whether "any other public authorities [besides the Department of Transportation] having jurisdiction over the roadway at the crossing had made any

---

1. Indiana has adopted its version of the MUTCD. *See* 120 IAC 4–3–1.

determination that this [Swain Street] crossing needed any roadway warning devices other than those which were already installed." Affidavit of A. Fred Hohl, para. 8. Reno contends that this testimony could only be hearsay because Hohl did not testify that he attended meetings of local authorities discussing the need for warning devices at the Swain Street crossing. Hohl testified, however, that he had personal knowledge of such local determinations, and that it was one of his job responsibilities to "work[ ] in conjunction with" local authorities. Affidavit of A. Fred Hohl, para. 4. Reno's contention that Hohl lacked personal knowledge is nothing more than speculation and an insufficient justification for striking this testimony.

More persuasive is Reno's argument that Hohl impermissibly makes legal conclusions in his affidavit. In paragraph five of his affidavit, Hohl testifies that decisions with respect to highway warning devices are made in compliance with the MUTCD. The court understands this testimony to indicate how Hohl and the design division which he managed made their decisions rather than as a legal assessment of the Department of Transportation's actual degree of compliance with the MUTCD. Hohl also states in paragraph five that the Indiana MUTCD has been approved by the Federal Highway Administration, a fact which this court does not consider a legal conclusion beyond the competence of a lay person. However, Hohl's testimony in paragraph five that the Indiana MUTCD "substantially conforms with the national MUTCD" is more in the nature of a legal assessment and will accordingly be stricken.

■ Turning to the preemption issue, this court finds persuasive the reasoning of those courts which have found state laws with respect to the need for railroad crossing devices to be preempted by the FRSA in light of the adoption of the MUTCD. Although the plaintiff skirts this point by focusing on policy and other considerations, the only conclusion that one can draw from reading 45 U.S.C. § 434 is that state laws on railroad safety are preempted by the Secretary's adoption of rules or regulations covering the same subject matter.

■ The more difficult question is whether the MUTCD fits within section 434's category of "laws, rules, regulations, orders, [or] standards" relating to the improvement of traffic control devices at grade crossings which would trigger preemption. In a sense, what the MUTCD does with respect to railroad crossing devices is delegate the decision-making process to local authorities rather than establish a standard in and of itself.

This view of the MUTCD as delegation rather than standard underlies the decisions of those courts applying what has been termed contingent preemption. Foremost among these is the opinion of the Ninth Circuit in *Marshall v. Burlington Northern, Inc.*, 720 F.2d 1149 (9th Cir. 1983). The court found no preemption of a state law claim based on the railroad's alleged negligence in failing to provide an adequate warning device at the crossing at issue. The court reasoned as follows:

[T]he Secretary has delegated federal authority to regulate grade crossings to local agencies.

The locality in charge of the crossing in question has made no determination under the [MUTCD] regarding the type of warning device to be installed at the crossing. Until a federal decision is reached through the local agency on the adequacy of the warning devices at the crossing, the railroad's duty under applicable state law ... is not preempted.

*Id.* at 1154. In this case, as in *Marshall*, no local standard pertaining to railroad crossing devices was in effect for the Swain Street crossing at the time of the accident.

However, section 434 provides that the Secretary's adoption of "a rule, regulation, order, or standard" covering a given subject matter preempts state law, and the *Marshall* court focussed solely on whether a particular type of standard had been established. In doing so, the *Marshall* court ignored the fact that the delegation to local authorities is only part of a regulatory regime relating to, among other things,

warning devices at railroad grade crossings.

The Tenth Circuit recently declined to follow the *Marshall* approach in *Hatfield v. Burlington Northern R.R. Co.*, 958 F.2d 320 (10th Cir.1992). The court summarized the preemptive effect of the FRSA as follows:

> The scheme of regulation is patent. Congress expressed an intent to invade the field of grade crossing safety devices, postponing that invasion only until the Secretary of Transportation adopted a rule, regulation, order, requirement, or standard relating to that field. The Secretary has responded by adopting the MUTCD and making it applicable to grade crossings. Recognizing the variability of conditions that arise at each intersection, the Secretary has delegated to local authority the responsibility of assessing the needs and establishing the design for safety devices. Nonetheless, the statutory mandate for the adoption of a standard that would supplement any state requirement for grade crossing safety devices is satisfied by the adoption of the MUTCD. To that extent, we disagree with *Marshall*.
>
> . . . .
>
> Having adopted the MUTCD, the Secretary prescribed the standard required by 45 U.S.C. § 434, and any state law relating to grade crossing safety devices was then superseded. All § 434 requires for preemption to occur is the adoption of the standard, and the MUTCD contains the standard. Postponing the determination of what specific device is required for a given grade crossing is simply a matter of implementing that standard. The scheme enacted by Congress did not anticipate that the effect of the standard was to be deferred or made selectively applicable for each grade crossing in the United States. To the contrary, once the Secretary adopted the standard, its superseding effect became uniform throughout the nation.

*Id.* at 323–324. Accordingly, the *Hatfield* court found that the plaintiff's state law claims based on an alleged breach of duty regarding the need to install warning devices at railroad crossings were strictly, not just contingently, preempted by the FRSA.

Also finding that strict preemption had occurred, the court in *Armijo v. Atchison, Topeka & Santa Fe Ry. Co.*, 754 F.Supp. 1526, 1530 (D.N.M.1990), recognized that "[t]he scope of preemption under the FRSA has been broadly construed by the courts," and this construction is consistent with the broad language of section 434. The state laws subject to being preempted under section 434 are those "relating to" railroad safety, and the Supreme Court has held that the use of the words "relating to" indicates "a broad pre-emptive purpose" on Congress' part. *Morales*, 112 S.Ct. at 2037. Such state laws can be preempted under section 434 by "a rule, regulation, order, or standard covering the [same] subject matter. . . ." As noted above, the analysis of whether preemption has occurred begins with the language used by Congress. *Id.* In light of the language of section 434, this court agrees with Judge Campos that "[t]he FRSA does not merely preempt those state laws which impair or are inconsistent with federal regulations. It preempts all state regulations aimed at the same safety concerns addressed by federal regulations." *Armijo*, 754 F.Supp. at 1531 (citation omitted). The MUTCD addresses the topic of railroad crossing safety, and state laws relating to this topic are accordingly preempted.

Such a broad construction of the scope of section 434's preemptive effect is also consistent with the goals of the FRSA. The plaintiff points to the tragic deaths of Brandon and Ryan Hungerford in this case and claims that safety concerns are not served by absolving Conrail of a duty to maintain safe railroad crossings. However, in enacting the FRSA, Congress directed the Secretary to make a comprehensive study of the railroad crossing problem and to attempt a coordinated solution. 45 U.S.C. § 433. Various statutes and regulations are used to implement this mandate, with the resulting system being one whereby states survey railroad grade crossings and then rank them in terms of the urgen-

cy of safety improvements needed. *See, e.g.,* 23 U.S.C. § 152(a).

The goals of this coordinated system could be thwarted if resources were diverted by piecemeal litigation. As the Tenth Circuit noted in *Hatfield:*

> Continuing resort to common law standards after a state adopts MUTCD disrupts a basic purpose of FRSA as it is implemented by the provision of funding, namely, recognition of priorities. FRSA contemplates that some sites are more dangerous than others and that resources should first be put to use on the more dangerous ones, all in accordance with a rational scheme based on surveys. Jury verdicts based on common law standards, which are of a high degree of abstraction and generality, are retrospective-looking and are addressed to only one crossing rather than a system of crossings. The hit-or-miss common law method runs counter to a statutory scheme of planned prioritization.

*Hatfield,* 958 F.2d at 324.

Unfortunate though it may be, we apparently do not have the resources to make all crossings safe at once, and Congress has dictated how limited resources are to be allocated.

In addition to this policy argument, the other arguments raised by Reno are unpersuasive. Much of Reno's argument deals with what Conrail's duties would have been under state law. This line of argument does not refute the existence of preemption. The court is also not persuaded by the cases cited by the plaintiff on the preemption issue, many of which fail to begin their analysis with the language employed by Congress in the FRSA and fail to consider the disruptive effect that the application of state law standards would have on the federal scheme.

Accordingly, the court concludes that the plaintiff's claims with respect to the need for additional grade crossing and/or traffic control devices and the failure to close the Swain Street crossing have been preempted by the FRSA and the regulations and the MUTCD adopted thereunder. The defendants' motion for partial summary judgment is granted.

It is so ORDERED.