**ENTERGY SERVICES, INC.
and Entergy Arkansas,
Inc., Plaintiffs,**

v.

**UNION PACIFIC RAILROAD
COMPANY, Defendant.**

No. 8:98CV345.

United States District Court,
D. Nebraska.

March 2, 2000.

Gerald L. Friedrichsen, William J. Riley, Fitzgerald, Schorr Law Firm, Omaha, Deborah E. Lamb, Tom F. Phillips, Fredrick R. Tulle, John P. Murrill, Brandon Kelly Bla, Taylor, Porter LA, Baton Rouge, LA, C. Michael Loftus, Frank J. Pergolizzi, Andrew B. Kolesar, III, Slover, Loftus Law Firm, Washington, DC, Otis H. Storey, Entergy Services, Inc., Little Rock, AR, for Entergy Services, Inc., Entergy Arkansas, Inc., plaintiffs.

Bartholomew L. McLeay, Patrick B. Griffin, Kutak Rock LLP, Beverly S. Greer, Union Pacific Law Department, Omaha, Jay T. Smith, Harris Weinstein, Alessio D. Evangelista, Corinne A. Goldstein, Covington, Burling Law Firm, Washington, DC, for Union Pacific Railroad Company, defendants.

## MEMORANDUM AND ORDER

STROM, Senior District Judge.

This matter is before the Court on Union Pacific's Motion for Judgment on the Pleadings Dismissing Plaintiffs' Unjust Enrichment Claim For Lack of Subject Matter Jurisdiction (Filing No. 118). This case involves a breach of contract suit by Entergy Services, Inc. ("ESI") and Entergy Arkansas, Inc. ("EAI") (hereinafter collectively referred to as "Entergy") against Union Pacific Railroad ("UP") based on Rail Transportation Agreements ("contract") whereby UP was to transport coal from the Powder River Basin ("PRB") in Wyoming and Montana to Entergy's coal-fired power plants in Arkansas. The facts of this case were previously recited at *Entergy Servs. Inc. v. Union Pac. R.R. Co.*, 35 F.Supp.2d 746 (D.Neb.1999), and will not be repeated here, except where relevant to the present motion. After careful consideration of the parties' briefs, the Court will deny UP's motion.

## I. FACTS

Entergy originally brought suit in October 1997, alleging that UP materially breached its coal delivery contract with Entergy, and that as a result of such breach, Entergy incurred damages. In its prayer for relief, Entergy requested the Court to enter a judgment, declaring that UP has materially breached the contract; that as a result of such breach, Entergy is excused from performance under those agreements; and requiring UP to pay all direct, consequential and incidental damages incurred by Entergy. After Phase I discovery was complete, UP filed a motion for summary judgment, asking the Court (1) to dismiss Entergy's complaint for breach of contract because UP did not breach the contract and (2) to find that the liquidated damages provision in the contract constituted Entergy's exclusive remedy for coal-delivery shortfalls. Entergy simultaneously filed a motion for Partial Summary Judgment, asking the Court to find that (1) UP breached the contract with Entergy, and (2) the liquidated damages specified in the contract were not Entergy's exclusive remedy for UP's breaches. The Court found that under the

terms of the contract, UP had a duty to deliver coal and for each month in which deficits were not made up, UP breached the contract. The Court declined to consider whether UP had materially breached the contract, concluding that this was a factual determination not appropriate for summary judgment. The Court noted, however, that where a material breach occurs, the non-breaching party is entitled not to perform. The Court held that although a liquidated damages provision does not preclude this common law right not to perform, the liquidated damages provision does preclude Entergy from seeking its actual monetary damages to a certain extent. The Court ruled that under the language of the liquidated damages provision, Entergy was precluded from claiming as actual damages the amount it spent to obtain alternate fuel supplies because this amount was covered by the liquidated damages provision. However, the Court ruled that the liquidated damages provision did not preclude Entergy from seeking any consequential damages Entergy may have sustained which were not a part of the cost of obtaining alternate fuel supplies.

After the Court's opinion was filed, Entergy amended its complaint, claiming that it was entitled to an additional remedy of restitution (Filing No. 113, ¶¶ 38, 45). In the amended complaint, Entergy requests cancellation of the contract from the date of UP's alleged material breach, and asserts that it is entitled to restitution equal to the amount that it claims UP has been unjustly enriched, i.e. the difference between the contract rate Entergy agreed to pay and the reasonable value for services UP provided. Entergy asks the Court to determine this "reasonable rate." In response, UP filed this motion for judgment on the pleadings, asking the Court to dismiss Entergy's unjust enrichment claim for lack of subject matter jurisdiction. UP contends that the Surface Transportation Board has exclusive jurisdiction over Entergy's restitution claim, or in the alternative, that the Court should refer the issue

to the Surface Transportation Board under the primary jurisdiction doctrine. Because UP seeks to dismiss only Entergy's unjust enrichment claim, the Court will treat UP's motion as a motion for partial judgment on the pleadings.

## II. STANDARD OF REVIEW

■ A motion for judgment on the pleadings should only be granted if the moving party clearly establishes that there are no material issues of fact and that it is entitled to judgment as a matter of law. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir.1999). The Court must accept the well pleaded material facts alleged by the non-moving party in its pleadings as true, and draw all reasonable inferences from those facts in favor of the non-moving party. *Independent Fed'n of Flight Attendants v. Cooper*, 141 F.3d 900, 901 (8th Cir.1998).

■ On a motion for judgment on the pleadings, if matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment. Fed.R.Civ.P. 12(c). Yet, it is within the court's discretion to exclude materials outside the pleadings. *Stearns v. Veterans of Foreign Wars*, 500 F.2d 788, 791 n. 9 (D.C.Cir.1974) (dicta). *See also Batt v. United States*, 976 F.Supp. 1095, 1096 (N.D.Ohio 1997) (stating that a trial court, in deciding a motion to dismiss, has discretion to exclude materials outside the pleadings); 2 Moore's Federal Practice (3rd ed) § 12.38 (stating that motions for judgment on the pleadings and motions to dismiss for failure to state a claim are analogous motions to which the same standards apply). Along with its motion for judgment on the pleadings, UP submitted two affidavits (Filing No. 119). The first is the affidavit of John H. Broadley, an attorney specializing in rail transportation litigation and former General Counsel of the Interstate Commerce Commission. The second is the affidavit of John Klick, an economic and

financial consultant concerning economic and financial studies of the railroad industry. The Court notes that both affidavits generally provide a history and overview explanation of Congressional railroad legislation throughout the years as well as detailed information concerning how the Interstate Commerce Commission, and now the Surface Transportation Board, determine reasonable rail rates. While these affidavits are helpful in gaining a historical overview of the legislation relevant to this motion, these affidavits are not essential to the Court in reaching its ruling on the motion because both affidavits contain publicly available information and legal conclusions, and they are hereby excluded from the Court's decision on the motion. *See Reno v. Consol. Rail Corp.*, 797 F.Supp. 700, 702–03 (S.D.Ind.1992). The affidavits do not contain factual assertions which might indicate that conversion to a summary judgment motion would be appropriate.

## III. DISCUSSION

### A. Exclusive Agency Jurisdiction

A brief history of rail legislation will be useful in determining this question of jurisdiction. Congress enacted the Interstate Commerce Act in 1887, creating the Interstate Commerce Commission (hereinafter "ICC") and empowering it to oversee all rates charged by railroads. The Interstate Commerce Act required all rates to meet a "just and reasonable" standard, and it authorized the ICC to determine what constituted a "just and reasonable" rate in a particular case. *Burlington N. R.Co. v. Interstate Commerce Comm'n*, 679 F.2d 934, 935 (D.C.Cir.1982). This standard remained virtually unchanged until 1976 when Congress found that railroad facilities had deteriorated, return on investment was far below the cost of capital,

and a succession of major railroad bankruptcies had occurred, due in part to excessive regulation. *Western Coal Traffic League v. United States*, 694 F.2d 378, 384 (5th Cir.1982) (citation omitted). As a result of these findings, Congress amended the Interstate Commerce Act with the Railroad Revitalization and Regulatory Reform Act ("4R Act"), Pub.L. No. 94–210, 90 Stat. 31 (1976). This legislation confined the ICC's rate regulation to situations in which the railroad had "market dominance" over the traffic involved. *Burlington N. R.Co. v. Interstate Commerce Comm'n*, 679 F.2d at 935. The purpose behind this legislation was to increase reliance on market forces rather than regulation in the governance of rail carriage, but to retain regulation where the market forces proved insufficient to protect shippers and the public from abusive railroad practices, especially in the case of so-called "captive shippers."[1] *Coal Exporters Assoc. v. United States*, 745 F.2d 76, 81, 97 (D.C.Cir.1984). The 1976 legislation limiting ICC jurisdiction had the effect of ending decades of ICC control over rail rates and permitting carriers not having market dominance to set rates in accordance with market conditions. *Arkansas Power & Light Co. v. Interstate Commerce Comm'n*, 725 F.2d 716, 719 (D.C.Cir.1984) (citations omitted).

Congress took another step toward deregulation in 1980 when it passed the Staggers Rail Act ("Staggers Act"). The Staggers Act sought to deregulate the rail industry further by allowing competition and the demand for services to determine reasonable rail rates, to the maximum extent possible. *Cleveland–Cliffs Iron Co. v. Interstate Commerce Comm'n*, 664 F.2d 568, 587–88 (6th Cir.1981). Because of Congress' continued belief that the rail industry was overburdened by regulation, Congress attempted to improve the indus-

---

1. Added protection was provided to "captive shippers" in 1980 when Congress passed the Long–Cannon Amendment, which dictated certain factors that the ICC was required to consider in determining whether to investi-gate a proposed rate, and in evaluating the reasonableness of the rate. *Arkansas Power & Light Co. v. Interstate Commerce Comm'n*, 725 F.2d 716, 719–20 (D.C.Cir.1984).

try's financial situation by allowing marketplace forces to regulate rail rates whenever possible. *Burlington Northern R.R. Co. v. Public Utility Comm'n of Texas,* 812 F.2d 231, 235 (5th Cir.1987) (citing H.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 100, *reprinted in* 1980 U.S.C.C.A.N. 3978, 4110, 4120). The goal of the Staggers legislation was to "treat[ ] the American railroad industry as any other business." *Id.* at 235 (citing 126 Cong. Rec. 28,431 (1980)) (statement of Rep. Staggers). To accomplish these objectives, Congress further limited the ICC's jurisdiction by restricting the situations in which the ICC could make a finding of "market dominance." *Western Coal Traffic League v. United States,* 694 F.2d 378, 385, 387 (5th Cir.1982). The Staggers Act provided that the ICC could only find "market dominance" if it found that the challenged carrier rate exceeded certain minimum threshold revenue-to-variable cost percentages. *Id.* at 588.

The Staggers Act also authorized railroads to enter into private rail transportation contracts with shippers which established rail rates, rather than requiring all rail traffic to move pursuant to tariff and regulatory rules. See Staggers Act, P.L. 96–448, 94 Stat. 1895 (1980) § 208, codified at former 49 U.S.C. § 10713(a) (providing that rail carriers "may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions."); *Cleveland–Cliffs,* 664 F.2d at 587–88. The Staggers Act § 208 provided that

(1) A contract that is approved by the Commission under this section, and transportation under such contract, shall not be subject to this subtitle, and may not be subsequently challenged before the Commission or in any court on the grounds that such contract violates a provision of this subtitle.

(2) The exclusive remedy for any alleged breach of a contract entered into under this section shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree.

*See* Staggers Act, P.L. 96–448, 94 Stat. 1895 (1980) § 208, codified at former 49 U.S.C. § 10713(i)(1) and (2). The first subsection exempted contracts filed with the ICC from the other provisions of the Interstate Commerce Act and from any subsequent review by the ICC, while the second subsection vested exclusive jurisdiction in the courts for enforcement of contracts that are filed with the ICC. *Cleveland Cliffs,* 664 F.2d at 587–88. The House Conference Report explained that Section 208 of the Staggers Act established a "separate class of rail service" for rail transportation contracts. *Id.* at 588 (quoting H.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 100, *reprinted in* 1980 U.S.C.C.A.N. 3978, 4110, 4132). Under this legislation, "[o]nce a contract [was] approved, it [could] not subsequently be challenged under the Interstate Commerce Act and any remedy for its breach [was] an action in court." *Burlington N. R.Co. v. Public Utility Comm'n of Texas,* 812 F.2d 231, 235 (5th Cir.1987) (citing former 49 U.S.C. § 10713(i)). Thus, contract transport was provided as an alternative to traditional common carrier rail transport. *Burlington N. R.Co. v. Surface Transp. Bd.,* 75 F.3d 685, 687 (D.C.Cir.1996). Courts interpreted section 208 as manifesting "an unequivocal intention that matters of contract dispute between shipper and carrier [were] to be decided by courts of law rather than by the ICC, and that rates established by contract [were] to be enforced, if anywhere, in the courts without review under the Interstate Commerce Act by the ICC." *Cleveland–Cliffs,* 664 F.2d at 592; *Burlington N. R.Co. v. Surface Transp. Bd.,* 75 F.3d at 687 (stating that "once the responsible agency ... has passed on a contract, transportation proceeds under its terms, free from agency oversight."). Generally, from 1980 forward, rail traffic either moved pursuant to rail transportation contracts (once the contracts were filed and approved by the ICC), or if no contract existed, pursuant to

the former scheme of common carrier tariff rates.

The latest chapter of deregulation in the rail industry occurred in 1995 when Congress enacted the Interstate Commerce Commission Termination Act ("ICCTA") (effective January 1, 1996), which abolished the ICC and transferred its responsibilities · to the Surface Transportation Board (hereinafter "STB"). *See* Pub.L. No. 104–88, 109 Stat. 803 (1995), codified generally at Title 49. The ICCTA also eliminated the requirement that rail transportation contracts be filed and approved, except in the case of contracts for transportation of agricultural products. 29 Federal Procedure L.Ed. § 67.52 (West 1997) (citing P.L. 104–88, 109 Stat. 803). Because of these changes, Congress altered slightly the wording of the subsection concerning rail transportation contracts, which now provides:

(1) A contract that is authorized by this section, and transportation under such contract, shall not be subject to this part [Part A–RAIL], and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of this part.

(2) The exclusive remedy for any alleged breach of a contract entered into under this section shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree. This section does not confer original jurisdiction on the district courts of the United States based on section 1331 or 1337 of title 28, United States Code.

49 U.S.C. § 10709(c)(1) and (2) (formerly 49 U.S.C. § 10713(i)). The ICCTA also redrafted a provision outlining the general jurisdiction of the STB:

The jurisdiction of the Board over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules),

practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). Because "this part" in the "except" clause of § 10501(b) *supra,* includes 49 U.S.C. § 10709, the provision authorizing rail transportation contracts, such contracts are excluded from the jurisdiction of the STB. Given this law and the legislative history of railroad legislation, the Court turns to the parties' arguments presented in this motion.

UP argues that under 49 U.S.C. § 10501(b) the STB has exclusive jurisdiction over Entergy's restitution claim. Entergy argues that 49 U.S.C. § 10709(c) controls because Entergy and UP entered into a contract and therefore, the courts have sole jurisdiction over this claim. UP responds that 49 U.S.C. § 10709(c) simply limits where a party can seek relief for a breach of contract, but that once a court holds that a breach *terminates* a contract, § 10709 does not authorize a court to prescribe a reasonable rail rate. UP argues that although a court may enforce the rail rate set forth in a contract in a breach of contract case, the Interstate Commerce Act precludes any form of judicial relief that imposes a different rate. UP contends that if Entergy wishes to seek restitution of amounts it claims UP charged in excess of a reasonable rate, its exclusive remedy is to petition the STB to prescribe a reasonable rate and to order repayment of any amounts it paid ·in excess of that rate. UP further notes that a Court of Appeal may then review the STB's decision. UP notes that the STB utilizes a

complex methodology in determining the reasonableness of a rail transportation rate, and argues that courts should not interfere with this uniform policy. *See Burlington N. R.Co. v. Interstate Commerce Comm'n,* 985 F.2d 589, 591, 596 (D.C.Cir.1993) (recognizing that the ICC's CMP ("constrained market pricing")/SAC("stand-alone cost") regulatory rule as the "preferred and most accurate procedure available for determining reasonableness" of rail rates). UP argues that if Entergy is alleging that the contract was in essence null and void at the time of material breach, then it is as if no contract existed and the STB's common carrier rates and formulas for determining reasonableness apply.

Entergy argues that only a court, and not the STB, may award restitutionary relief for breach of contract. Entergy claims that by entering into a contract, the parties removed themselves and their obligations from the regulatory arena. Therefore, the STB's complex rate formulas are irrelevant. Entergy argues that in the context of negotiated contracts, the term "reasonable," as used in its Amended Complaint, has nothing to do with the CMP/SAC formulas which evaluate rates charged by a hypothetical competitor; instead, the focus in determining a "reasonable" rate for restitution purposes is simply on the marketplace value of comparable service during the period in question.

The law certainly seems to be settled, and the parties agree, that post–1980, issues of contract interpretation, determinations of breach, and appropriate remedies, if any, are properly determined by the courts. *See supra* at 1084, *Burlington Northern R.Co. v. Surface Transp. Bd.,* 75 F.3d at 687; *Cleveland–Cliffs,* 664 F.2d at 592. *See also Burlington N. R.Co. v. Interstate Commerce Comm'n,* 679 F.2d at 941–42 (stating that "Upon Commission approval of a contract filed under Section 208(a), the 'exclusive remedy for any alleged breach' is a court action, not an ICC

proceeding"[;] the ICC must "leave to the appropriate court ... the question of any interim or final remedy for the breach of contract...."). The STB itself recognizes that it is "without rate reasonableness jurisdiction over the rate of any rail transportation provided by contract." *Central Power & Light Co. v. Southern Pac. Transp. Co.,* 1996 WL 741369 (S.T.B. Dec. 27, 1996) (citing 49 U.S.C. § 10709(c)) (stating that in the Staggers Act, Congress made contracts 'a separate class of rail service' that once entered into, were thereafter exempt from all regulation and all of the requirements of the Interstate Commerce Act). "It is well established that, under 49 U.S.C. § 10709(c)(1), transportation under a rail contract may not be challenged on the ground that it violates the Interstate Commerce Act, as amended by the ICC Termination Act of 1995." *Omaha Pub. Power Dist. v. Union Pacific Railroad Co.,* 1997 WL 638221 (S.T.B. Docket No. 42006, October 16, 1997). The question remains, however, whether this conclusion remains true even where the requested remedy for breach is cancellation of the contract and determination of a reasonable rate for purposes of restitution. The Court notes that this narrow issue appears to be one of first impression.

At least one case contains a statement which suggests that even equitable relief from a contract is properly addressed in the courts, rather than the agency. *See Burlington N. R.Co. v. Interstate Commerce Comm'n,* 679 F.2d at 942 (stating that "The courts to which the Staggers Act has committed contract questions are adequately equipped to determine whether alleged agreements are in fact binding legal contracts *and whether, in equity, relief from an agreement would be appropriate.*") (emphasis added). However, there have been few cases where the court was faced with a jurisdictional issue when for one reason or another the transportation contract no longer applied. The Court notes that in one instance, a court held that once the contract ends, the STB has

jurisdiction over the service. In that case, where a transportation contract had expired, such that no contract covered the service between the carrier and the shipper, the court held that the STB had jurisdiction. *Burlington N. R.R. Co. v. Surface Transp. Bd.,* 114 F.3d 206 (D.C.Cir.1997). The Court finds that the instant situation between UP and Entergy, where the plaintiff alleges breach and cancellation, differs from *Burlington N. R.Co. v. Surface Transp. Bd.* The parties in *Burlington Northern R.Co. v. Surface Transp. Bd.* chose not to enter into a renewed contract when the contract term expired, and in effect, elected to remove themselves from contract law and re-enter the arena governed by the Interstate Commerce Act. The Court finds that, unlike the situation where the parties chose to exclude themselves from contracts, both Entergy and UP chose to be within contract law when it entered into these long-term contracts in 1983. They have not decided now to exclude themselves from contract coverage. Rather, in the instant situation, the possible cancellation of the contract comes about only as a result of the Court determining a proper remedy for a breach of contract, and as a result, cancellation of the contract is wound up with and inseparable from the Court performing its function of resolving breach of contract questions.

A recent district court case supports this conclusion. In *Miller v. WD–40 Co.,* 29 F.Supp.2d 1040, 1043 (D.Minn.1998), a motor carrier had a contract with a shipper, but that contract term expired, and the parties continued to ship goods. Subsequently, the shipper declared bankruptcy and the trustee sought to recover from the carrier the amounts he believed were in excess of reasonable rates after the contract had expired. The district court acknowledged a jurisdictional provision in the statutes relating to motor carrier contract service, which is remarkably similar to the rail contract service provision, which states that "[t]he exclusive remedy for any alleged breach of a contract entered into

... shall be an action in an appropriate State court or United States district court, unless the parties agree otherwise." *Miller,* 29 F.Supp.2d at 1043. The Court noted that "[w]hile transportation law is admittedly a highly complex web of statutory and administrative regulation, the issue here [was] one of simple fact: specifically whether the negotiated rate of Transportation Contract # 1113 or a common tariff applies." *Id.* Therefore, the Court concluded that it had jurisdiction over the suit. The ultimate issue in *Miller,* however, was actually a fact question concerning whether the parties had a mutual agreement that the transportation contract would continue in force after its expiration. Thus, the court in *Miller* did not directly address whether the court retained jurisdiction after a breach and cancellation of the contract.

■ Finding no case law directly on point, the Court looks to the ICC's perception of its own jurisdiction as instructive on this issue, although not binding. In *Cross Oil Ref. & Mktg., Inc. v. Union Pac. R.R. Co.,* (S.T.B. Finance Docket No. 33582, October 19, 1998), Cross Oil filed a complaint with the STB requesting the STB to order UP to cease and desist from an allegedly unreasonable and inadequate rail service. UP filed an answer and a motion to dismiss for lack of jurisdiction, alleging that the STB lacked jurisdiction because the traffic at issue moved under transportation contracts entered into pursuant to 49 U.S.C. § 10709. Cross Oil first argued that the purported contracts were not transportation service contracts, such that they would be excluded from the STB's jurisdiction. The STB rejected this argument. Cross Oil then argued that even if the contracts were valid, that since the time that UP breached the contracts, it was acting on a common carrier basis and such service was subject exclusively to the Board's jurisdiction. The STB also rejected this argument. The STB first noted the well established principle that "[I]ssues regarding the breach, or precise con-

struction of [contract] terms will have to be resolved in an appropriate court of law." The STB then went on to the more precise issue of who has jurisdiction over the rail service after an alleged breach of contract occurs:

> Moreover, if a contract is breached, the underlying service is not, as Cross Oil claims, recharacterized as common carriage subject to our jurisdiction. *See also Burlington Northern R. Co. v. PUC of Texas,* 812 F.2d 231, 235 (5th Cir. 1987) (citation omitted) ("Once a contract is approved, it may not subsequently be challenged under the Interstate Commerce Act and any remedy for its breach is an action in court.").

The STB also cited to its decision in *Ford Motor Co. v. Security Servs. f/k/a/ Riss Internat'l,* 9 I.C.C.2d 892, 895 (1993). Although *Ford Motor Co.* did not involve the *rail* transportation statutes, it does address the question of how the remaining service is to be treated when a breach of contract is found. The STB concluded in *Ford Motor Co.* that

> Under [a contract-carrier] relationship, the carrier cannot subsequently unilaterally recharacterize the traffic as common carrier traffic and rerate the charges using its common carrier tariffs. In other words, if there is a contract carrier relationship to provide services within the scope of the carrier's permit, and the carrier performs those services, there is no statutory basis for this Commission, the parties, or their successors-in-interest, to remedy any actual or asserted deficiencies or breaches of the contract or performance thereunder by voiding the contract carrier relationship and retroactively treating the transportation as that of a motor common carrier.

*Id.* Relying on this language, the STB granted UP's motion to dismiss for lack of jurisdiction. Consequently, the STB has taken the position that a breach of contract (and an implied assertion that the contract was therefore canceled) does not convert contract service into common carrier service over which the STB has jurisdiction. The Court agrees with this reasoning. After a thorough review of the Interstate Commerce Act's legislative history and the purpose behind creating a separate class of service for rail contracts, as well as cases and agency decisions, the Court concludes that it retains exclusive jurisdiction for determining the appropriate remedy, including cancellation and restitution, for breach of this contract.

UP additionally argues that despite the language in 49 U.S.C. § 10709(c)(2) providing for resolution of contract breaches in the courts, the specific language of 49 U.S.C. § 10709(b) prevents this Court from exercising jurisdiction over claims which would add duties, other than those specified by the terms of the contract. 49 U.S.C. § 10709(b) (formerly § 10713(h)). UP argues that by pleading restitution, which UP contends is an equitable remedy outside the terms of the contract, Entergy has presented principles which are outside the scope of this court's jurisdiction. In support of this proposition, UP cites *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995), which dealt with *inter alia* a state court's jurisdiction to hear a breach of contract claim between an airline and its passengers. In *Wolens,* the Supreme Court held that state court adjudication of contracts entered into between an airline and its customers does not violate the Airline Deregulation Act's preemption clause (enacted to ensure that states would not undo federal deregulation with regulation of their own). The *Wolens* case states that because the state court is looking solely at the contract itself, the court is not "enacting or enforcing any law relating to rates, routes, or services or any air carrier," in violation of the preemption clause. At least one other published district court case expanded this notion by stating that where the plaintiff is seeking equitable relief, i.e. looking for relief from principles beyond the contract terms itself, state courts are preempted under the Airline

Deregulation Act from hearing the dispute. *See Breitling U.S.A. Inc. v. Federal Express Corp.*, 45 F.Supp.2d 179 (D.Conn. 1999).

The Court could not locate in the Airline Deregulation Act, a statute comparable to the provision in the Interstate Commerce Act, as amended, authorizing contracts and providing that their adjudication be in the state or federal courts. Because of this lack of similar statutory language, the Court finds that *Wolens* and *Breitling* are not applicable here where the issue is not preemption of state courts' jurisdiction, but rather the proper scope of the court's jurisdiction affirmatively granted in 49 U.S.C. § 10709. Instead of relying on those cases, the Court finds that it is more appropriate to decide whether the Court has jurisdiction by analyzing, as it has, the statutory framework of the Interstate Commerce Act and by determining whether the Court's interpreting and resolving this breach of contract dispute would interfere with national transportation policy. Furthermore, it is not clear that 49 U.S.C. § 10709(b), which prohibits other duties beyond the contract, applies to determining a court's *jurisdiction* since jurisdiction is dealt with extensively in subsection (c) of § 10709. In any event, the Court finds that resolving this breach of contract suit does not impose additional duties upon UP outside what the parties agreed to in the contract. Subsection (b) simply provides that a contract entered into between two parties contains all the duties to which the parties are required to adhere. The legislative history indicates that this subsection was enacted to make clear that other previous regulatory duties imposed on carriers in the past would not be applied unless drafted into the parties' contract. The Court concludes that while § 10709(b) prohibits these other extra-contractual *duties,* it does not preclude Entergy's potential *remedies* for breach of contract. Thus, the Court finds that § 10709(b) is not violated, and adheres to its determination that jurisdiction of Entergy's restitution claim is proper in this Court.

## B.  Primary Jurisdiction Doctrine

UP argues that even if the Court concludes that jurisdiction is appropriate in this Court, the Court should refer the issue to the Surface Transportation Board under the primary jurisdiction doctrine. "Under the doctrine of primary jurisdiction a court may leave an issue for agency determination when in involves the special expertise of the regulated field." *DeBruce Grain, Inc. v. Union Pac. R.R. Co.*, 149 F.3d 787, 789 (8th Cir.1998). In this case, UP contends that the issue of what constitutes a "reasonable rate" in rail service has always been determined by the ICC and its successor, the STB, according to complicated economic principles. It is true that the ICC had a long history of determining reasonable rates for rail service, and that in the past, courts which interfered with the national transportation agency's expert rate-setting policies were subject to reversal. However, rail legislation in the late 1970's and early 1980's actually precluded the ICC, and now the STB, from construing rail transportation contracts, breaches and remedies. Thus, it can hardly be said that retention of this breach of contract case by the Court invades the STB's area of expertise.

■  Stated another way, the primary jurisdiction doctrine only applies where the agency and the courts have concurrent jurisdiction. *DeBruce Grain Inc. v. Union Pac. R.R. Co.*, 983 F.Supp. 1280, 1284–85 (W.D.Mo.1997) *aff'd by* 149 F.3d 787, 789 (8th Cir.1998). "It is inappropriate to invoke the doctrine of primary jurisdiction in a case in which Congress, by statute, has decided that the courts should consider the issue in the first instance." *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir.1984) (citation omitted). A review of the legislative history of the Interstate Commerce Act indicates that the STB lacks jurisdiction over claims for breach of rail transportation contracts. In fact, as discussed above, the STB's juris-

diction has been limited to situations involving allegations of market dominance. For these reasons, the Court concludes that referral to the STB would be inappropriate. *See Miller v. WD–40 Co.*, 29 F.Supp.2d 1040, 1045 (D.Minn.1998) discussed *supra*, (declining to invoke the primary jurisdiction doctrine because the question before the court required a simple determination of whether a negotiated transportation contract or a common tariff applied when the contract expired and because referring the matter to the STB, where no issues of national transportation policy were implicated, "would turn this breach of contract action into a more complex dispute than necessitated by the facts."). Defendant's motion to refer this issue to the STB under the primary jurisdiction doctrine will be denied.

## IV. CONCLUSION

The Court concludes that Entergy's restitution claim is properly within this Court's jurisdiction. The Court declines to refer the issue to the STB under the primary jurisdiction doctrine. Thus, UP's motion will be denied based on the two grounds asserted in its motion.

However, the Court recognizes that U.P.'s motion might be properly granted on other grounds. General contract law provides that restitution is an alternative remedy for breach of a fully enforceable contract, and that a non-breaching party may seek money damages for its restitutionary interest, as Entergy does here. Yet, an award of the restitutionary interest usually means to return to the non-breaching party the value of its partial performance prior to breach, so that the breaching party is not unjustly enriched as a result of that breach. The Court is not entirely satisfied that restitution is an appropriate remedy under the specific facts of this case and the Court's previous rulings. Because the parties have not addressed these issues, the Court declines to rule on them at this time.

IT IS ORDERED that UP's motion for judgment on the pleadings to dismiss Entergy's unjust enrichment claim is denied.